# INDIANAPOLIS ROLLING MILL *v.* ST. LOUIS, FORT SCOTT & WICHITA RAILROAD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

Submitted January 7, 1887. — Decided January 31, 1887.

The president of a manufacturing corporation who is also its superintendent, having general authority to contract by parol contract without the corporate seal for making and delivering its manufactured goods, has like authority, unless the power is withdrawn, to authorize the termination and release of such a contract.

A board of directors of a corporation to whom the president of the company communicates his execution of a contract on the part of the corporation, which is within its corporate powers but unauthorized by the board, will be presumed to ratify his act unless it dissents within a reasonable time; and a delay in the disaffirmance of six months after knowledge of the act is an unreasonable delay.

THIS was an action at law on a contract for the sale and purchase of railroad iron. Judgment for defendant. Plaintiff sued out this writ of error. The case is stated in the opinion of the court.

*Mr. H. C. McDougal* for plaintiff in error.

*Mr. John F. Dillon* and *Mr. J. H. Richards* for defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Circuit Court of the United States for the District of Kansas.

The plaintiff in error, which was also the plaintiff below, is a corporation existing under the laws of Indiana, and doing business in that state. The defendant in error is a corporation of the State of Kansas. The latter company, while building its railroad, contracted, on the 8th day of October, 1881, with the former for the purchase ol iron rails. The contract was

for ten thousand tons, to be delivered, during the period between October and June inclusive, on board of the railroad cars at Indianapolis. A jury was waived and the case was tried before the court, which made a finding of facts on which it declared the law to be for the defendant, and rendered judgment accordingly.

During the trial the defendant company produced a release, apparently executed by the plaintiff company, from the obligation of the contract to receive and pay for the iron, except so far as it had been fulfilled, and upon the validity of this release the decision depends.

It appears from the facts found by the court that the plaintiff was in the habit of receiving payment for iron delivered, by drafts on the defendant, payable in New York, and that Moran Brothers were the financial agents of the defendant, through whom such payments were made; that drafts to the amount of $54,000 were due on the 4th day of October, 1882, and the company, being hard pressed for money, asked an extension of payment, which was granted for four months; that when these drafts again fell due they were protested for non-payment, and the defendant company was insolvent, which fact was well known to the plaintiff. It appears, also, that Mr. Thomas, who was the treasurer of the plaintiff company, visited New York and called upon the firm of Moran Brothers, at whose banking-house said drafts were payable, and endeavored to induce them to pay the drafts, but that Moran Brothers, who had no funds of the defendant's at the time, declined to do so, but finally said: "We, Moran Brothers, will pay these drafts if you will sign a release for the balance of the contract." To this Mr. Thomas replied that he was not authorized to execute such a release, but he communicated with Mr. Jones, who was the president and superintendent of the company, and obtained from him authority to accept the money and sign the release. This was accordingly done, the release being dated "New York, 8th February, 1883," and signed "Indianapolis Rolling Mill Co., by J. Thomas, treasurer."

It is said by the plaintiff that Mr. Thomas had no authority to execute this release, or to make this contract, and, there-

fore, it is void.  Bearing upon this proposition, it is found as
a matter of fact by the court, that Mr. Jones was president
and Mr. Thomas treasurer at the time of this transaction.  The
original contract for the sale of the iron is executed by Mr.
Jones, as president, without the seal of the company, and there
is no evidence of any resolution of the board of directors au-
thorizing or approving that contract.   The by-laws of the
plaintiff corporation, as the court finds, declare that the super-
intendent, who in this case was Mr. Jones, "shall have charge
of the works, property, and operations of the company, and
shall employ all operatives and certify all wages due and other
expenditures to the secretary, . . . and shall, with the ap-
proval of the president, buy and sell material and make all
contracts for the same, and for work," &c.  And the court
further finds that under this by-law Mr. Jones had the power
to buy and sell material, and to make all contracts for the
same.   Another by-law declares that "the superintendent and
all other persons shall in all cases be subject to the control of
the board of directors, in everything where the board shall
elect to exercise such control;" and the court finds that, in
the making of the original contract sued on, and in the exten-
sion of the time for the payment of drafts, as hereinafter men-
tioned, the board of directors of plaintiff did not at any time
or in any way elect to exercise the control over its officers
given said board by said by-laws.

The court further finds "that, after the return of Mr.
Thomas from the city of New York to Indianapolis, some
time in March, there was a meeting of the board of directors
of plaintiff, at which the validity of the release executed by
Mr. Thomas was discussed; but the records do not show that
at that particular meeting any definite action was taken; that
the directors at that meeting did in fact agree to submit the
question to counsel of plaintiff, let him investigate it, and then
act upon his advice; that about two years after this meeting
and a year and a half after this suit was commenced, a *nunc
pro tunc* entry was made upon the records of plaintiff of the
proceedings of plaintiff's board of directors, which showed
a repudiation upon the part of the board of directors of the

release so executed, and that this suit was originally instituted in this court at the first term thereof after the execution of the release."

We concur with the court below that on the facts thus stated the release, was a valid release. Its execution was of that class of business which, under the by-laws of the corporation and the course of business between these parties, had been confided to the president and superintendent, both of which offices were held by Mr. Jones. The direction given by Mr. Jones to the treasurer, Mr. Thomas, both of whom were also directors in the corporation, was within the line of his authority. He had under this same authority, without any express resolution or ratification of the board of directors, made the contract on which this suit is brought; and it would seem that, not being under seal, a simple contract concerning the ordinary business of the company, the same power which enabled him to make it was sufficient to enable him to release it, unless the power had been withdrawn.

· Another principle leads to the same result. These by-laws show that the board of directors retained the power in their hands to control the president and superintendent in any transaction, whenever it was thought proper to do so. This matter was reported to the directors; they had a meeting upon the subject some six weeks after the whole thing had been consummated, and after they had received the benefit of the release by the payment of their drafts. The rule of law upon the subject of the disaffirmance or ratification of the acts of an agent required that if they had the right to disaffirm it they should do it promptly, and, if after a reasonable time they did not so disaffirm it, a ratification would be presumed. In regard to this it appears that the board, when notified of what had been done by their agents, did not disaffirm their action at that time, but that the act or resolution of disaffirmance was passed about two years after notice of the transaction, and that if the suit brought in this case can be considered as an act of disaffirmance, it came too late, as it was commenced some six months after they had knowledge of the release. As was stated in the somewhat analogous

case of the *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 592, "the authorities to the point of the necessity of the exercise of the right of rescinding or avoiding a contract or transaction as soon as it may be reasonably done, after the party, with whom that right is optional, is aware of the facts which gave him that option, are numerous. . . . The more important are as follows: *Badger* v. *Badger*, 2 Wall. 87; *Harwood* v. *R. R. Co.*, 17 id. 78; *Marsh* v. *Whitmore*, 21 id. 178; *Vigers* v. *Pike*, 8 Cl. & Fin. 650; *Wentworth* v. *Lloyd*, 32 Beav. 467; *Follansbee* v. *Kilbreth*, 17 Ill. 522; *S. C.* 65 Am. Dec. 691." See also *Gold Mining Co.* v. *National Bank*, 96 U. S. 640; *Law* v. *Cross*, 1 Black, 533.

It is said that the release was without consideration, because Moran Brothers had the means in their hands to pay the drafts, of the property of the defendants, but we think the finding of facts clearly disproves that; indeed, the court found, as a matter of fact, that the defendants were then insolvent, and that Moran Brothers had no funds in their hands out of which they could have paid the drafts. It is obvious, therefore, that the consideration for this release was the voluntary payment by Moran Brothers of the existing protested drafts of the plaintiff company out of their own means and not out of the means of the defendant corporation. We think this was a sufficient consideration to support the release.

*The judgment of the Circuit Court is, therefore, affirmed.*