## PIGEON RIVER RY. CO. et al. v. CHAMPION FIBRE CO.

(Circuit Court of Appeals, Fourth Circuit. March 21, 1922.)

### No. 1919.

1. **Railroads ⬥154—Guaranty of bonds of another company puts bondholder on inquiry as to relation between companies.**

   One who took bonds issued by one railroad company on which was indorsed a guaranty of their payment by another company is put on inquiry as to the relations between the companies which would reveal that the property of the company issuing the bonds had been leased to the company guaranteeing their payment.

2. **Corporations ⬥180—Corporation owning all the stock of another held not entitled to complain of the management thereof with two other corporations under contract to which it was a party.**

   Where a corporation owning all the stock and bonds of another corporation participated in a contract intrusting the management of the latter and two other corporations as branches of a common business to an individual and another corporation controlled by him, owning a majority of of the stock in each, it cannot complain that this method of doing business is carried out, and must submit to mistakes of judgment, and may complain only if it can show that they sacrificed the interest of the corporation whose stock and bonds it controlled to their own.

3. **Corporations ⬥180—Corporation and individual given management of several corporations in which they owned the majority of stock held bound to give notice to minority directors of proposed transaction out of the ordinary.**

   Where the management of several corporations is intrusted to an individual and a corporation controlled by him, owning a majority of the stock in each, but the minority stockholders were represented on the board of directors of the principal company, they were bound to give the minority directors notice of any action proposed to be taken by the board of directors out of the ordinary course of business, so as to give them an opportunity to object to the action and to protect their interests if such were taken over their objection.

4. **Corporations ⬥474—Minority stockholders held to have acquiesced in plan of majority to pledge of bonds.**

   Where the minority stockholders of affiliated corporations had been notified of the meeting of the directors of the various corporations at which it was proposed to arrange for a loan, and had been informed after the meeting, which they did not attend, that it was decided to pledge the bonds of one company as collateral to secure its debt for a much

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

smaller amount to another company, so as to permit the pledgee to use the bonds in borrowing money for the furtherance of the enterprise, and the minority interests made no objection to the plan but permitted the majority to sell the bonds for the purpose indicated with their indorsement which subsequently required them to take up the bonds, the minority stockholders had acquiesced in the transaction and could not thereafter object that the pledge of the bonds for that purpose was unauthorized.

**5. Corporations ⬳474—Pledgee who is also trustee owes beneficiaries duty to give actual notice of sale.**

Where the pledgee of corporate bonds was also a trustee for the stockholders of the corporation, it owed to its beneficiaries the duty to give actual notice of a proposed sale of the bonds under the pledge and a purchase of the bonds by it for inadequate price is invalid, though the publication of legal notice as required by the contract was made.

**6. Railroads ⬳152—Trustee under mortgage not necessary party to suit to determine validity of pledge of bonds.**

The trustee under a mortgage given by a railroad company to secure its bonds is not a necessary party to a suit between the stockholders of the company to determine the validity of a pledge of the bonds by the company to another corporation controlled by the majority stockholders.

**7. Corporations ⬳474—Tender of debt unnecessary to a suit attacking right of trustee to bonds either as owner or pledgee.**

Where the minority stockholders of a corporation attacked the right of the majority to bonds of the corporation purchased by them at a sale under a pledge, both on the ground that the original pledge of the bonds of the corporation controlled by the defendants was unauthorized and because the subsequent sale under the pledge to the defendants was void, a tender of payment of the debt due defendants and secured by the pledge was not necessary.

Waddill, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of North Carolina, at Asheville; James E. Boyd and Edwin Y. Webb, Judges.

Suit in equity by the Champion Fibre Company against the Pigeon River Railway Company and another. Decree for complainant, and defendants appeal. Reversed in part, and affirmed in part.

Sidney S. Alderman and William P. Bynum, both of Greensboro, N. C. (Fred H. Ely, of Philadelphia, Pa., on the brief), for appellants.

Julius C. Martin and Thomas S. Rollins, both of Asheville, N. C. (Martin, Rollins & Wright, of Asheville, N. C., on the brief), for appellee.

Before KNAPP, WOODS, and WADDILL, Circuit Judges.

WOODS, Circuit Judge. On March 6, 1913, the Pigeon River Railway Company made three notes to Champion Lumber Company, each for $39,981.51, due May 1, 1915, 1916, and 1917, and delivered as collateral its mortgage bonds aggregating $570,000. Champion Lumber Company pledged these notes as part collateral to secure its notes of same date to David G. Wilson, trustee, aggregating $328,921.67.

The notes of Champion Lumber Company were sold—all of them except notes to the amount of about $3,000 with and by means of the indorsement of the corporation Wm. Whitmer & Sons. The Champion

Lumber Company having failed to pay its notes at maturity, Wm. Whitmer & Sons paid all of them, including those not indorsed by that corporation, and became the owner. As owner of the Champion Lumber Company's notes it took over the notes of the Pigeon River Railway Company to Champion Lumber Company and the $570,000 of bonds of Pigeon River Railway Company deposited by Champion Lumber Company as collateral to its notes.

The Pigeon River Railway Company also failed to pay its notes. On February 7, 1917, James G. Campbell, president of Wm. Whitmer & Sons, Inc., notified Wilson, trustee, that notes of Pigeon River Railway Company were unpaid, and demanded sale of the $570,000 of bonds of Pigeon River Railway Company held by Whitmer & Sons as collateral. On the same day Wilson, trustee, demanded of James G. Campbell, president of Pigeon River Railway Company, payment of its two notes then due, and gave notice that on failure to pay he would sell its bonds for $570,000 deposited as collateral. Accordingly the bonds were sold in the city of Philadelphia, after published notice, at public auction, to Wm. Whitmer & Sons for $2,500.

The Champion Fibre Company attacks the delivery of the $570,000 of bonds of Pigeon River Railway Company as collateral for its notes to Champion Lumber Company, the repledge of the bonds to Wilson, trustee, and the sale made by him to Wm. Whitmer & Sons. The interest of the Champion Fibre Company arises out of its ownership of $180,000 of bonds of Pigeon River Railway Company of the same issue as the $570,000 bonds purchased by Wm. Whitmer & Sons. The mortgage property securing these bonds will fall far short of paying the aggregate issue of $750,000. If it be held that the $570,000 of bonds were improperly issued from the treasury of the Pigeon River Railway Company, the plaintiff's $180,000 of bonds would probably be paid; but, if the $570,000 bonds were properly issued to Champion Fibre Company as collateral and are now the property of Whitmer & Sons, the distribution of the proceeds of any sale of the property of Pigeon River Railway Company between Wm. Whitmer & Sons and the Champion Fibre Company, in the proportion of $570,000 to $180,000, would leave a large proportion of the plaintiff's debt unpaid.

The District Court held the hypothecation of the bonds of Pigeon River Railway Company to Champion Lumber Company, their rehypothecation to Wilson, trustee, and the sale by Wilson, trustee, to Wm. Whitmer & Sons, invalid; and, applying the rule that equality is equity, decreed as an equitable result that Whitmer & Sons was entitled, as of March 6. 1913. to $120,000 of the bonds for its debt in round numbers of $120,000 of that date—because the Champion Fibre Company had accepted $180,000 of bonds for its debt of $180,000, in pursuance of its agreement of December 21, 1910. Wm. Whitmer & Sons, Inc., appeals.

From the mass of evidence, documentary and oral, a statement of the vital facts in their proper relation will make plain the right legal conclusions. On December 21, 1910, J. D. Lacey and Charles I. James owned and controlled all the stock and bonds of Pigeon River Lumber Company and of the Tennessee & North Carolina Railroad

Company. The property of the Pigeon River Lumber Company consisted chiefly of a large tract of timber known as the Crestmont tract and a sawmill thereon. The T. & N. C. R. R. Company was used chiefly to carry the mill product to the Knoxville Branch of the Southern Railway. The Champion Fibre Company owned a large tract of timber known as the Sunburst tract, and owned and controlled all of the stock and bonds of the Pigeon River Railway Company. The Pigeon River Railway Company was partially graded, and when completed was to be used mainly to carry the timber from the Sunburst tract to the Murphy Branch of the Southern Railway. Robert F. Whitmer, A. B. Leach & Co., Clark L. Poole & Co. and De Vitt Tremble & Co., owned and controlled all the stock of the Parsons Lumber Company and of Wm. Whitmer & Sons and of the Appalachian Railway Company. On December 21, 1910, the parties above named entered into a contract looking to the formation of a new corporation—afterwards chartered under the name of Champion Lumber Company—and to the acquisition by it of the tracts of timber and sawmills, and all the property of the Pigeon River Lumber Company, and to the control of the T. & N. C. R. R. Company and Pigeon River Railway Company. The contract is complex and reference is omitted to its provisions and the action taken under it, except such as are essential to an understanding of the questions involved.

In accordance with this contract the Champion Fibre Company received for its property above mentioned 2,100 shares of the preferred and 9,500 shares of the common stock of the Champion Lumber Company, $400,000 in cash, and $180,000 of the mortgage bonds of the Pigeon Railway Company. These bonds of the Pigeon River Railway Company were taken in payment of $180,000 expended by the Champion Fibre Company on the partial construction of the road. Robert F. Whitmer and his associates, A. B. Leach & Co. and others, were to take under the agreement 18,500 shares of the stock of the Champion Lumber Company. Leach & Co. and others were to furnish the money necessary to settle with the plaintiff and others as agreed, taking therefor the mortgage bonds of the new company at 90 per cent. of par. It is important to observe that the contract clearly contemplated that R. F. Whitmer, who controlled the corporation, Wm. Whitmer & Sons, should have the controlling interest in the Champion Lumber Company, Pigeon River Railway Company and T. & N. C. Railroad Company, and that he should manage these corporations. Accordingly, on the organization of the Champion Lumber Company, Whitmer & Sons had 18,462 shares out of a total of 30,000, while the Champion Fibre Company had 9,498. As trustees for the stockholders of the Champion Lumber Company, R. F. Whitmer held 394 of the 400 shares of Pigeon River Railway Company, and 2,288 of the 3,061 shares of the T. & N. C. Railroad Company. It is thus apparent that R. F. Whitmer and Wm. Whitmer & Sons, Inc., actually acquired legitimate control of the three corporations. In this control and management they represented their own beneficial ownership of about two-thirds interest in the three corporations, and in a trust relation the interest of the Champion Fibre Company.

Whitmer & Sons appears to have had full faith in the new corporation, Champion Lumber Company, and advanced large sums to it from time to time, aggregating in the whole about $2,000,000. All this was lost except 4 per cent. paid to the unsecured creditors in the ultimate bankruptcy of the Champion Lumber Company in 1916.

In the early part of 1913 the financial difficulties of the Champion Lumber Company were giving concern. At that time and afterwards R. F. Whitmer and Wm. Whitmer & Sons were undoubtedly in control of both railroad corporations as well as of the Champion Lumber Company, in the manner above indicated. We think, therefore, Whitmer and Whitmer & Sons must be held, throughout all subsequent transactions, to the full responsibility of the utmost good faith as trustees for all persons interested in the several corporations. The Champion Fibre Company was represented, however, by three directors on the board of the Champion Lumber Company; and obviously neither R. F. Whitmer nor Wm. Whitmer & Sons can be held responsible to the Champion Fibre Company for any neglect of duty or failure to act with diligence by these directors representing it.

The Pigeon River Railway Company had been leased on January 1, 1913, to the T. & N. C. Railroad Company for 30 years. There is nothing in the record to show that the lease was not legal, or that it was not made in good faith, or that any effort was made to conceal its existence. From December 21, 1910, to March 6, 1913, the Champion Lumber Company had expended on the construction of the Pigeon River Railway about $120,000. The mortgage of the Pigeon River Railway Company, executed on January 1, 1913, provided that its issue of $750,000 of bonds should "be used and sold for the purpose of completing, finishing, improving, or operating the railroad of the Railway Company and paying indebtedness incurred in constructing, completing, improving or operating its railroad." The stockholders of the Pigeon River Railway Company, at their meeting of October 26, 1912, which authorized the execution of the mortgage and bonds, passed a resolution:

"That the board of directors place the said bonds on the market as soon as may be. selling them for not less than ninety per cent. of their face value net to the company, or in the discretion of the board of directors, to hypothecate said bonds as collateral for loans to the company or both."

The bonds were indorsed by guaranty of the lessee, the T. & N. C. Railroad Company. This guaranty was authorized at a meeting of the directors of the T. & N. C. R. R. Company, but it does not appear that the stockholders gave any authority for the guaranty. It seems that the Pigeon River Railway was operated by the T. & N. C. Railroad Company at a profit, but that, in its general operation, the T. & N. C. Railroad Company became indebted to the Champion Lumber Company $55,868.75.

[1] The plaintiff alleges that it had no notice of this lease. Absence of notice to plaintiff, however, would only indirectly affect the issue here involved, as a circumstance bearing on the charge of laches of the plaintiff. The indorsement of the $180,000 of bonds held by plaintiff with the guaranty of the T. & N. C. Railroad Company was suffi-

280 F.—36

cient we think to put plaintiff on inquiry as to the relation of the two railway companies. Generally such an indorsement indicates a lease. This and other circumstances, together with the lack of any testimony on behalf of plaintiff denying notice of the lease, negatives the inference that the plaintiff did not have notice.

The Champion Lumber Company was in urgent need of funds for the prosecution of its business and could not borrow on its own credit. In this situation Whitmer & Sons undertook to raise the funds necessary for the conduct of the business of the Champion Lumber Company by the corporate action expressed in the contract of Champion Lumber Company, Pigeon River Railway Company, and T. & N. C. Railroad Company, dated March 6, 1913, called the "collateral trust agreement." It provided that the Champion Lumber Company should issue its notes to a trustee for $330,000 in the aggregate; that the T. & N. C. Railroad Company should give its notes to the Champion Lumber Company for $195,000—which included the amount of its indebtedness to Champion Lumber Company and further advances to be made—and deposit as collateral its first mortgage bonds to the amount of $154,000; that the Pigeon River Railway Company should give its notes to the Champion Lumber Company for $140,000, secured by first mortgage bonds of $570,000; and that the Champion Lumber Company should have the right to repledge these notes and collateral as security for its notes for $330,000. This action was authorized at meetings of the directors of the several corporations held in pursuance of notice to all directors. It was contemplated, though not expressed in the trust agreement or in the meeting of the directors of any of the corporations, that the Champion Lumber Company should raise the money on its notes by each stockholder taking notes equal to 11 per cent. of his stock. Champion Fibre Company failed to take its share of the notes, and the result was that Whitmer & Sons raised the money for the Champion Lumber Company by indorsing its notes secured as above recited, and when they fell due was obliged to take them up.

There seems to be no denial that the Pigeon River Railway Company had the legal right, under the mortgage and the resolution of its board of directors, to pledge in good faith, as collateral for a bona fide debt incurred for construction, any of the $570,000 of bonds in the treasury after $180,000 of the bonds had been turned over to the Champion Fibre Company.

The question of the insolvency of the Pigeon River Railway Company on March 6, 1913, when the pledge was made, may not be free from difficulty; but we agree with the District Court that on that date the assets were not equal to its total liabilities of $300,000, and that there was no prospect of paying its debt of $120,000 to the Champion Lumber Company from earnings in the course of its business. Yet it was a going concern, and its value to its creditors depended on the continued operation of the Champion Lumber Company—from which it secured nearly all of its business. It was therefore of the utmost importance that the Pigeon River Railway Company should give the Champion Lumber Company such security for its debt as would enable that corporation to raise money to relieve its embarrassment and

continue business, in the interest of plaintiff as well as of Wm. Whitmer & Sons; for the Champion Fibre Company had in proportion to its holdings, which were very large at that time, the same interest in the success of the Champion Lumber Company as R. F. Whitmer and Wm. Whitmer & Sons. It seems evident that on March 6, 1913, Whitmer & Sons expected the Champion Lumber Company to continue operations and work out, or it would not have indorsed the notes and raised the money for that purpose. This connoted the expectation of keeping the Pigeon River Railway Company as a going concern, for its operation was necessary to the Champion Lumber Company.

[2] Plaintiff having participated in a contract which provided that R. F. Whitmer and Whitmer & Sons, Inc., should manage the three corporations, in all their necessarily intricate dealings with each other as branches of one common business, cannot complain that this method of business was carried out. It must submit to any mistakes of judgment, and may complain only if it can show that R. F. Whitmer or Whitmer & Sons sacrificed the interest of the Champion Fibre Company to their own.

There is no proof nor intimation of misappropriation by R. F. Whitmer or Whitmer & Sons, nor of malfeasance in the general management of the business of any of the corporations. There is no claim that either of them profited by any of the corporate transactions. It is admitted that the debt of $120,000 to Champion Lumber Company was just. There is no proof that the collateral given by the Pigeon River Railway Company was at the time excessive; the fact that money could not be raised on it without the indorsement of Whitmer & Sons seems to justify the inference that it was not.

It is to be borne in mind that the circumstances under which the Champion Fibre Company took $180,000 of bonds of the Pigeon River Railway Company in satisfaction of its debt for a like amount were very different from the conditions confronting the corporations on March 6, 1913, when Whitmer & Sons indorsed the notes of Champion Lumber Company on the faith of the bonds of Pigeon River Railway Company. Champion Fibre Company voluntarily took $180,000 of bonds as a full equivalent and full payment for its debt of $180,000 at a time when all parties apparently were confident of the success of the enterprise launched by the contract of December 21, 1910. Besides, other larger considerations were important inducements to the Champion Fibre Company for accepting the $180,000 of bonds. But the Champion Lumber Company had never agreed to a similar arrangement. It was entitled to payment in money of its debt of $120,000; it had never agreed and was in no way bound to accept bonds of any amount in payment or as security.

Summarizing, Whitmer & Sons and Champion Fibre Company were in these relations: On the one hand, R. F. Whitmer and Wm. Whitmer & Sons voluntarily entered into a trust relation with the Champion Fibre Company and others interested in the several corporations, requiring of them the utmost good faith in the corporate transactions directed by them. On the other hand, the plaintiff, Champion Fibre Company, voluntarily agreed that Whitmer and Whitmer & Sons

should control the corporations through stockholdings and directors and officers selected by their direction, relying on their judgment and good faith, and on the additional protection of the diligence and influence of three directors representing its interest on the board of directors of the Champion Lumber Company. Champion Fibre Company having agreed to Whitmer and Whitmer & Sons exercising this control over the corporations, it bound itself by the corporate actions taken by the boards of directors of the corporations, acting in good faith within the scope of their legal powers. It had the right, however, to have the three directors representing it on the board of the Champion Lumber Company notified to be present at all meetings of that board. When action was contemplated out of the ordinary routine of corporate management, affecting in a material degree the interests of the Champion Fibre Company, we think it clear that the duty was on Whitmer and Whitmer & Sons to give special notice to these directors of the particular action in view. The contemplated plan of having Champion Lumber Company take $570,000 of bonds of the Pigeon River Railway Company as collateral to a debt of $120,000 was a matter out of the usual routine of corporate management, vitally and particularly affecting the interest of the Champion Fibre Company; and it was therefore entitled to have its representatives on the board, including its own president, specially notified of the plan. It had the right through these directors to object, and, if objections failed, to have opportunity to take legal steps to prevent any unlawful sacrifice of its interest.

[3] Obviously the trust assumed by Whitmer and Whitmer & Sons was a very onerous one, often requiring delicate discrimination between their own interests and the interests of the corporations they were controlling and the interests of the Champion Fibre Company. In making these discriminations it seems very clear that they were entitled to the aid, suggestions, and objections of the Champion Fibre Company through its representatives on the board of directors of the Champion Lumber Company. The Champion Fibre Company through these directors assumed a correlative duty to Whitmer and Whitmer & Sons. Its president and the other directors representing it on the board of the Champion Lumber Company owed the duty to object to any contemplated action, or any action taken, considered by them unduly inimical to the interests of the Champion Fibre Company, or in any way unfair or injudicious. Manifestly the Champion Fibre Company could not sit silent when through its president and representative directors it had knowledge of the action contemplated or already taken in time to have the matter reconsidered. Such silence, in the absence of actual fraud on the part of Whitmer or Whitmer & Sons, is acquiescence and consent which the plaintiff cannot repudiate long after the transaction has become interwoven into the other business transactions of the corporation.

We think it would have been a breach of trust, and at least a constructive fraud, for Whitmer and Whitmer & Sons to have procured the pledge of $570,000 of bonds—a transaction out of the ordinary course of business and materially affecting the interest of the Champion Fibre Company—without notice to or opportunity of the Champion

Fibre Company or its representatives on the board of directors to object. It may be that the transaction would have been invalid on the ground that the Pigeon River Railway Company was insolvent and could not legally make such a preference. But neither of these objections could avail the Champion Fibre Company if it, and its representatives on the board of directors of the Champion Lumber Company, allowed the transaction to proceed to consummation and to the actual advancement of credit and money by Whitmer and Whitmer & Sons when it had opportunity to make timely objection and failed to do so.

The testimony is undisputed that the three directors representing Champion Fibre Company, one of them its president, had timely notice of the meetings of the board of directors of Champion Lumber Company concerning the pledging of bonds of Pigeon River Railway Company to Champion Lumber Company. The notice was in these words:

"Meetings of the Champion Lumber Company, Pigeon River Railway Company and Tennessee & North Carolina R. R. Company directors have been called for Monday, March 3d, at ten o'clock a. m., at the office of Wm. Whitmer & Sons, Philadelphia, Pa.

"At these meetings we expect to arrange details of the loan to the lumber company, and to pass such resolutions by the various companies as may be necessary to carry same into effect.

"It is important that we have as full a meeting as possible, and I trust that you will be able to attend."

None of these directors attended the meeting or made any objection to the loan. If the plaintiff, and its president and the other directors representing it, did not know of the plan to be presented to the board, surely plaintiff should have offered testimony on a point so vital in support of its allegations of fraud and unfair advantage. No such testimony was offered.

[4] On March 11, 1913, three days after the notes and collateral were given to Champion Lumber Company by the Pigeon River Railway, Campbell, vice president of the Champion Lumber Company, wrote a letter to all the stockholders of Champion Lumber Company —including Champion Fibre Company—setting forth in detail the entire transaction. He also at the same time wrote a letter to Thompson, president of the Champion Fibre Company and a director representing it on the board of the Champion Lumber Company, calling his special attention to the matter. In this letter was enclosed a copy of the collateral trust agreement above mentioned, which set out with the most explicit detail the entire plan for the issuing of the notes and the pledging of the collateral, including the $570,000 of bonds of the Pigeon River Railway Company. Champion Lumber Company had not then sold the notes with Whitmer & Sons' indorsement, and it was not too late to abandon the plan of raising money and revoke the corporate act. Still no objection was made by the plaintiff or any one for it. Not only so, but plaintiff offered to the court no word of denial of knowledge of this transaction while it was pending, and no word of explanation of its apparent acquiescence for more than five years afterwards. This silence, then and on the trial, leads to the irresistible inference that the Champion Fibre Company assented to the plan to secure money for the Champion Lumber Company, with the view of promoting its own in--

terest as owner of one-third of the stock of that company. It knew that the notes were about to be issued and the money paid for them into the treasury of the Champion Lumber Company. It was after all this that Whitmer & Sons, without notice of any objection by plaintiff, indorsed the notes and obtained the money for Champion Lumber Company; and eventually took up the notes when Champion Lumber Company defaulted in payment and went into bankruptcy. Under these circumstances it was too late on November 26, 1917, when this action was commenced, for the plaintiff to claim the aid of the court in setting aside the pledge of $570,000 of bonds of the Pigeon River Railway Company, and their repledge to Whitmer & Sons.

The conclusions above stated are in accordance with the principles laid down in the following cases: Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 591–593, 23 L. Ed. 328; Hotel Co. v. Wade, 97 U. S. 13, 22–23, 24 L. Ed. 917; Leavenworth v. Chicago, etc., Ry. Co., 134 U. S. 688, 705–708, 10 Sup. Ct. 708, 33 L. Ed. 1064; Fitzgerald Const. Co. v. Fitzgerald, 137 U. S. 99, 109, 110, 11 Sup. Ct. 36, 34 L. Ed. 608; Sanford Co. v. Howe Co., 157 U. S. 312, 316–320, 15 Sup. Ct. 621, 39 L. Ed. 713; Indianapolis Rolling Mill v. St. Louis Rrd., 120 U. S. 256, 7 Sup. Ct. 542, 30 L. Ed. 639.

[5] The sale of the $570,000 of bonds of Pigeon River Railway Company, at auction in the city of Philadelphia, after public advertisement, and the purchase by Wm. Whitmer & Sons for the very inadequate price of $2,500, stands on an entirely different footing and cannot be sustained for a moment, because plaintiff had no notice of the sale.

Whitmer & Sons, it is true, was pledgee of the bonds, whose claim to them as security plaintiff had by its laches lost the right to dispute. But Whitmer & Sons was none the less trustee, bound to take every precaution to safeguard the rights of the plaintiff and all others interested in the bonds and their sale. Its duty to give plaintiff express notice of the time and place of the sale, a matter so out of the usual course of corporate business, seems too plain for discussion or the citation of authority. The chance that plaintiff would receive notice through ordinary publication of the legal notice was remote. It is no answer to say the advertisement was, according to the contract, legal and gave constructive notice. Whitmer & Sons was charged with the utmost diligence in the protection of plaintiff, and that required express notice.

[6] The trustee under the mortgage of the Pigeon River Railway Company is not a necessary party to this suit and it is not necessary that it should bring the suit, because there is no controversy as to the validity of the mortgage or as to the enforcement of any right or remedy under it. It is an entirely separate controversy, as to the ownership and sale of bonds in which nobody has any interest except the plaintiff. Whitmer & Sons and the Pigeon River Railway Company.

[7] Tender of its debt to Wm. Whitmer & Sons was not necessary as a condition precedent to the suit. The attack of the plaintiff is on Whitmer & Sons' right to the bonds, either as owner or pledgee. Tender of the debt to Whitmer would have destroyed the right to attack the pledge.

A decree will be entered reversing the decree of the District Court holding the pledge of the $570,000 of bonds of the Pigeon River Railway Company and their possession by Whitmer & Sons to be illegal, and affirming the decree in so far as it holds the sale of the bonds at public auction in the city of Philadelphia to be invalid.

WADDILL, Circuit Judge (dissenting). The real contest in this case arises over the issuance, disposition, and hypothecation of an issue of $750,000 of the bonds of the Pigeon River Railway Company, secured by mortgage upon its property. On the 1st day of January, 1913, $180,000 of this issue was taken by the appellee, the Champion Fibre Company in settlement of an indebtedness due to it for expenditures made in the construction of the Pigeon River Railway. At a later date, the residue of the said issue of bonds, amounting to $570,000, was issued and delivered to the Champion Lumber Company as collateral security for the payment of three notes for $39,981.51 each, due by the Pigeon River Railway Company to the Champion Lumber Company, and the Champion Lumber Company was authorized to rehypothecate the said notes and bonds to secure its own indebtedness. Subsequently, the Champion Lumber Company delivered said notes aggregating $119,944.53 due it by the Pigeon River Railway Company and rehypothecated the said $570,000 of bonds as collateral security for an indebtedness of its own, amounting to $328,921.67. The notes of the Champion Lumber Company, with the exception of $3,000, were indorsed by the firm of William Whitmer & Sons, Inc., and the money raised thereon practically all furnished by said William Whitmer & Sons, Inc. The collaterals attached to said notes were delivered to David G. Wilson, trustee. Neither the Pigeon River Railway Company nor the Champion Lumber Company paid the notes at maturity, and William Whitmer & Sons, Inc., took up the same, and subsequently called upon Wilson, trustee, to sell the $570,000 of bonds of the Pigeon River Railway Company so deposited as collateral, and they were accordingly sold to William Whitmer & Sons, Inc., for $2,500, and they now claim to own the same.

The Champion Fibre Company attacks as well the issue as the hypothecation of the $570,000 of bonds by the Pigeon River Railway Company alike for its own indebtedness of $119,944.53, as the attempted hypothecation of said bonds as security for the payment of the debts of the Champion Lumber Company, and the sale of the bonds so hypothecated to William Whitmer & Sons, Inc. The mortgaged property securing the issue of bonds will not probably sell for more than enough to pay the appellee's bonds of $180,000, and if the subsequent $570,000 issue and hypothecation is held valid, the holders of the original bonds would only receive from the proceeds of the sale of the mortgaged property, its pro rata share; in other words, assuming that the mortgaged property would sell for $200,000, the appellee on account of its holdings of $180,000 of the bonds so issued to meet an indebtedness of $180,000, incurred in building the railroad, would receive only $48,000; whereas, on account of the open account indebtedness of the company remaining unpaid, in round figures $120,000, the so-

called issue and attempted hypothecation of the $570,000 of bonds would net to their holders $152,000.

The District Court set aside and declared that all proceedings had in connection with the issue and hypothecation of the $570,000 of said bonds, save to an amount equal to the actual indebtedness of approximately $120,000 due by the Pigeon River Railway Company on the three notes aforesaid, was null and void, for the reason that the relation that William Whitmer & Sons, Inc., bore to all of the properties and companies in question, being in effect the virtual owners of the same, and the dominating and controlling influence in them all, was such that the effort to so hypothecate and dispose of the $570,000 of bonds, operated as a fraud upon the appellee, the Champion Fibre Company, the holder of $180,000 of said bonds, and the court accordingly held that only $120,000 of the $570,000 were lawfully issued and held on account of the transactions aforesaid, and that the remainder of the issue, viz., $450,000, should be canceled. In other words, the lower court held the relationship of William Whitmer & Sons, Inc., by virtue of their ownership in and dominating control of all of said properties, was fiduciary in character, and that the effort to issue and hypothecate in its own interest, an issue of bonds of a company that it controlled and owned, was invalid, in so far as it operated to diminish the security, or destroy the first issue of $180,000 of bonds held by the appellee.

The learned judge of the lower court, in a most comprehensive and elaborate opinion, reviewed the transactions between these several companies from their organizations down to the consummation of the wrong here complained of. One or two excerpts from his opinion and findings will greatly elucidate the subject:

"Indeed, it is patent from the testimony that from their organization, the Tennessee & North Carolina Railroad Company, Pigeon River Railway Company and the Champion Lumber Company were subsidiary corporations of William Whitmer & Sons, and ever since their organization they have been financed by William Whitmer & Sons, and the chief object of these corporations has been to serve and subserve the interests of William Whitmer & Sons, their creators." (Record, p. 460.)

"It should be particularly remembered that when the Whitmer interests bought these $570,000 of bonds at the sale in Philadelphia, Whitmer & Sons owned all of the stock of the Pigeon River Railway Company and all of the stock of the Champion Lumber Company—in other words, they actually owned the two corporations. Indeed, the conclusion is irresistible that from the organization of these two companies Whitmer & Sons dominated and controlled them and a majority of persons on the board of directors of these corporations, who were subservient to, or mere agents of Whitmer & Sons; so, in reality, when the Pigeon River Railway Company pledged its $570,000 of bonds as security for its notes to the Champion Lumber Company, it was really the Whitmer interest dealing with the Whitmer interest; and when the Whitmer interests bought the $570,000 bonds, they were in reality merely buying them from themselves for themselves, and all at the expense of and injury of the plaintiff." (Record, pp. 461, 462.)

"Under these circumstances equity cannot sustain any such financial juggling or corporate dickering when the result is to injure another party."

"I do not find as a fact that there was actual fraud in these various transactions which led to the plaintiff's injury, though there are 'badges' which might properly move a less charitable court to come to a contrary conclusion; but the transactions of the Pigeon River Railway Company, the

Champion Lumber Company and Whitmer & Sons from and including January 1, 1913, March 6, 1913, and April 18, 1917, under all the circumstances, constitute glaring legal or constructive fraud upon the rights of the plaintiff." (Record, p. 463.)

"The court further holds that, as a matter of law, the Pigeon River Railway Company had no authority in law or equity to authorize the Champion Lumber Company to repledge the Pigeon River Railway's notes and bonds to secure the payment of a debt due by the Champion Lumber Company. The stockholders of the Pigeon River Railway Company never authorized such a rehypothecation, and the directors exceeded their authority when they attempted to authorize it." (Record, p. 467.)

The majority opinion is directly contrary to that of the lower court, and validates the issue and the rehypothecation of the $570,000 of bonds as well for the indebtedness of the Pigeon River Railway Company, as that of the Champion Lumber Company, which largely destroys appellee's security. The decision of the District Court does not deprive the appellant, William Whitmer & Sons, Inc., of the entire value of the collateral security, but validates the same to the extent of $120,000, instead of $570,000, which, in the light of all the facts and circumstances, is, in my judgment, all that in equity and good conscience it is entitled to ask for.

It is with reluctance that I differ from my Brethren, but I am firmly convinced that the practical effect of their decision is to reward the wrongdoers, and penalize the innocent in this transaction, and that, too, in the face of the findings of the lower court, with which I am in entire accord, as well on the law as on the facts.

Moreover, if the transactions respecting the issue, hypothecation and sale of the $570,000 of bonds, are not invalidated for the reasons herein stated, then, manifestly, in the light of the decision of the lower court, finding that the Pigeon River Railway Company was insolvent on the date of the alleged hypothecation of said bonds, to wit, the 6th of March, 1913, they should be voided, as constituting an illegal preference in favor of William Whitmer & Sons, Inc., the dominating and controlling influence that directed the affairs of all of said companies, in order to secure the payment of past due obligations of the Pigeon River Railway Company, held in their interest.