### SEABOARD SURETY CO. v. FIRST NAT. BANK & TRUST CO. IN SIOUX FALLS.

#### No. 11803.

Circuit Court of Appeals, Eighth Circuit.

June 12, 1941.

Irwin A. Churchill, Lewis Benson, and William S. Churchill, all of Huron, S. D., for appellant.

John H. Voorhees, Theodore M. Bailey, M. T. Woods, Roswell Bottum, and Howell L. Fuller, all of Sioux Falls, S. D., for appellee.

Before STONE, THOMAS, and JOHN-SEN, Circuit Judges.

STONE, Circuit Judge.

Robert Graff (doing business as Albert Graff and Company) had separate contracts with the States of Minnesota and of South Dakota for highway construction on definite projects. Appellant was surety on bonds to assure performance of each of these contracts. Its contracts with Graff included an assignment of any amounts due on the contracts, as indemnity for any losses to the surety because of the bonds. When he stopped work thereon, because of winter weather in November, 1937, he was paid for the work then done less percentages (amounting to over $6,000) retained under the contracts. January 3, 1938, he borrowed $4,500 from appellee secured by an assignment of moneys due under the contract. This loan was not made until he had delivered to appellee a written consent to such assignment executed by an "Attorney in Fact" of appellant. Graff did no further work under either contract and appellant, under the terms of its bonds securing performance of the contracts, completed the work. Although the work was so completed by appellant at an expenditure within the prices of the respective contracts, it suffered loss as to each contract exceeding the above percentage retentions retained by the respective States. Although informed of appellee's claims to such retained amounts, the States paid them over to appellant.

This action was brought by appellee to recover from appellant such payments up to the amount of the above loan and interest thereon. From a judgment for appellee (plaintiff), appellant brings this appeal.

The prayer of the petition was that the court determine that the retained percentages so paid to appellant: "are subject to an equitable lien in favor of plaintiff prior and superior to any lien or claim of the defendant and that said funds in defendant's hands are impressed with a trust in favor of plaintiff, and that defendant cannot in good conscience nor equitably retain the same, and that it be adjudged and decreed that defendant pay to plaintiff

out of said sums" the above loan with interest. The issues presented here are (1) existence of an· equitable lien in appellee superior to that of appellant (with resultant trust relationship); and (2) the authority of the attorney in fact to consent to the assignments to appellee. The court found such authority existed and that appellee had a superior equitable lien so that the above payments to appellant were held by it as trustee for appellee to the extent of appellee's loan and interest thereon.

### (1) Equitable Lien.

■ It is useful to examine, *unaffected by the above consent* by the attorney in fact, the relative rights of these parties. At the threshold of this examination, we are met by the problem of what law—of which jurisdiction—is to be here applied. This is a matter of substantive law. People's Electric Ry. Co. v. McKeen Motor Car Co., 8 Cir., 214 F. 73, 74. Under the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we must apply the law of the particular State. In so far as this controversy involves the reserved payment for construction in South Dakota, there is no difficulty. This is so because both the note and assignment to the bank and the bond of the surety are contracts made and to be performed in South Dakota. Clearly, the law of that State must govern there.

■ As to the Minnesota construction contract, the situation is not so simple. There the bond of the surety was made and performed in Minnesota while the note and assignment to the bank were made and to be performed in South Dakota. Federal courts follow the law of the State within which the federal district court is sitting as to matters of comity. Parker v. Moore, 4 Cir., 115 F. 799, 802, certiorari denied 187 U.S. 644, 23 S.Ct. 844, 47 L.Ed. 347. South Dakota courts enforce rules of comity unless such recognition is to the prejudice of its own citizens or prevents complete justice being done. Knittle v. Ellenbusch, 38 S.D. 22, 159 N.W. 893. Here, neither of these exceptions is present so there is no rule of the forum as to comity which would prevent recognition of the law of Minnesota, if it is otherwise applicable. We think the law of Minnesota applies to this situation because the situs of the fund upon which the lien, in the nature of a constructive trust, is claimed is located in that State.

There is no conflict in the testimony. Since the facts (outlined above) controlling the two situations (South Dakota and Minnesota construction contracts) are identical, we will state the positions of the parties as to this issue. Thereafter, the law of South Dakota and of Minnesota will be examined and applied in the light of the facts. The rights of the appellant are founded upon its relation as surety entitled to subrogation and upon the written general assignments of deferred payments in the indemnity agreements contained in the applications of Graff for the two respective construction contracts. The rights of appellee are based on the assignment of these deferred payments as security for its loan and the asserted equity that the proceeds of the loan went into payment of claims against the contractor arising under the contracts. The legal problem presented by these facts is which of the above opposed rights is of superior equity. We now examine the law on this problem as to the South Dakota situation and as to the Minnesota situation, respectively.

■ *As to South Dakota.* Counsel seem in agreement that there is no decision by the Supreme Court of South Dakota on this matter and we have been unable to find such. While it adds little help here, since it is but statutory recognition of the right of subrogation in a surety for reimbursement, the statutes of South Dakota expressly recognize such right, South Dakota Code of 1939, §§ 26.0210–26.0212. Lacking such State authority, we must determine this matter ourselves. Appellee urges we should follow what it says is the rule in Minnesota. No sufficient reason is stated why this South Dakota situation should be governed by the rule of Minnesota any more than that of any other State. We think we should follow the doctrine heretofore announced in the federal courts. That has been clearly announced by the Supreme Court (Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, and Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412) and by this Court (Riverview State Bank v. Wentz, 8 Cir., 34 F.2d 419). In principle, these three cases are not distinguishable from the one now before us. All of them determine the superior equity to be in the surety. We so hold as to the South Dakota situation.

■ *As to Minnesota.* Appellee urges four Minnesota cases as directly determin-

ing the law as to which of the above equities here is superior.[1] Appellee·states the law of those cases thus: "The surety's equities are superior if the bank loans the money to the contractor to be used by him as he sees fit either in the performance of the contract or in any other way. On the other hand, the bank's equities are superior if the money is to be used only for the payment of claims and 'the agreement was performed by both parties'."

This statement of the rule is not entirely accurate. The rule developed in those cases (adding thereto Ganley v. City of Pipestone, 154 Minn. 193, 191 N.W. 738) is that the equity of the surety, through subrogation, is superior to that of one loaning money to the contractor, even though such money goes into performance of the contract, unless such money is loaned under a contract obligating the lender to make advances (whether or not limited as to aggregate amount) to the contractor for use in performance of the work contract and unless such advances are so used.[2]

---

[1] These cases are National Surety Co. v. Berggren, 126 Minn. 188, 148 N.W. 55; New Amsterdam Casualty Co. v. Wurtz, 145 Minn. 438, 177 N.W. 664; Standard Oil Co. v. Remer, 167 Minn. 352, 209 N.W. 315; and Hartford Accident & Indemnity Co. v. Federal Construction Co., 168 Minn. 202, 209 N.W. 911.

[2] Considering these four cases in chronological order, the development of the Minnesota rule is shown as follows.

*The Berggren case.* This case involved a construction contract with the State of Minnesota. The application, upon which the construction bond was made, contained provisions for reimbursement of the surety and, for that purpose, an assignment of payments due under the contract. Shortly after the work began, the bank loaned the contractor the amount of the contract price for the work and took from him an order or draft on the State for the contract price. The surety relied upon subrogation and the assignment. The bank contested subrogation on the ground that the bond was a contract of insurance for pay and not as surety; and asserted that the assignment gave no priority. The court gave no consideration to the assignment because it found subrogation sufficient to determine priority in the surety. The court cited Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, and Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547. It stated the holding of those cases to be that the equity of the surety was superior "to that of one who loaned money to the contractor to be by him used as he saw fit, either in the performance of his contract or in any other way" (148 N.W. at page 56); and that the facts in those cases were "substantially identical with those in the case at bar." Also, the court held the contract of indemnity took effect as of its date.

*The Wurtz case.* Here was a construction contract with bond for performance. There was a contract indemnifying the surety. The arrangement between the bank and the contractor was that all money received by the contractor on the contract should be deposited in an account from which no money should be drawn therefrom except for labor and material on the construction contract; and that, if such deposits were insufficient to carry on the work, the bank would make advances to the contractor, on his notes, crediting such to this account. The arrangement with the bank was performed by both parties. The court held the equity of the bank superior because its advances had, pro tanto, discharged the obligations of the principal and surety and because "the bank was bound to finance the contractor. Its obligation to him was no less clear than plaintiff's [surety's] obligation to laborers and materialmen". 177 N.W. at page 665. It distinguished the Berggren, Prairie State Bank and Henningsen cases for the reason that in those cases there was no obligation on the bank to finance the construction contract where there was such obligation in the instant case saying:

"We think the distinction above noted may justly be drawn, and that one who has made an agreement with a contractor such as there was in the present case stands in a different position from one who voluntarily loans money to him." (177 N.W. at page 666).

That the governing reason for the superior equity of the bank, in the Wurtz case, · was the obligation of the bank to make advancements is made clear by the definition of the holding in the Wurtz case contained in Ganley v. City of Pipestone, 154 Minn. 193, 191 N.W. 738, 741, where the situation was the same as in the Wurtz case.

*The Remer case.* This case is the same, in essentials, as the Wurtz case except that Remer did not keep a separate bank account for the construction contract. He deposited in the same account money from the contract and from other sources and checked thereon for contract and

The position of appellant is that, even if Minnesota law is applicable (which it contests), yet (1) there was neither pleading nor proof of Minnesota law as, it urges, is required by South Dakota decisions; and (2) that the facts here bring this situation within that part of the Minnesota rule giving the surety priority because the proceeds of this loan were not in pursuance of a contract by the bank to make advances to be used exclusively for this Minnesota construction contract but the use of the borrowed money was left to the contractor, Graff, even though he may have used some of it on this construction contract.

(1) It is conceded that no pleading nor formal proof was made of the Minnesota law. Appellant contends that such pleading and proof are necessary under the law of South Dakota and cites three South Dakota cases. Subsequent to the latest of these citations, South Dakota enacted section 36.0702, S.D.Code of 1939, which required judicial notice of the statute and common law of other States, provided "reasonable notice shall be given to the adverse parties either in the pleadings *or otherwise*" (Italics added). However, we need not determine this matter of practice since, we think appellant is right in its second contention.

■ (2) This second contention is that the equity of the surety is superior here, under the Minnesota rule, because the bank was under no contract obligation to Graff to advance money to be used in this work

but made the loan leaving it to Graff to use the money as he saw fit. Determination of this issue depends upon the evidence.

A concise outline of the pertinent evidence as to procurement and handling of this loan is as follows. This South Dakota construction contract was referred to as the Lake County work while the Minnesota contract is referred to as the Glenwood work. During 1936 and 1937, Graff had work on four different construction jobs—the Lake County, the Glenwood, the Brown County and the Brookings County; and this was known to the bank. During this period, the bank was loaning him money until, in the summer of 1937, he owed about $32,000. Witness (president of the bank) did not know whether Graff was doing the principal amount of his banking, during this period, with the bank but he had an account there. As Graff took in money from his various contracts, this indebtedness was reduced. The bank was receiving direct from the State Highway Commission the checks for this work on the two contracts other than the two involved here. In November, 1937, all work was stopped because of the winter season.

The latter part of December, 1937, Graff wanted to borrow $4,500 "to pay bills due on his work so that he could start in the spring." The bank knew the Lake County and the Glenwood work was then uncompleted and that the Brown and Brookings Counties work was finished but whether these last two had been paid for it did not know. It did know he needed money for

other purposes. The court held this situation as to the bank account did not prevent its decision being controlled by the Wurtz case.

*The Hartford case.* This was a contract to construct a city school with the usual performance bond, by the Hartford as surety. Prior to this contract, the contractor had borrowed money from the bank giving assignments of money due it under *other* contracts. Shortly, before the construction contract here involved, the contractor stated to the bank that it expected to get the school contract "and, if it did, it would need money to take care of bills for labor and materials while waiting for the payment of the architect's estimates, and asked the bank to advance the money". 209 N.W. at page 912. The bank agreed to make advances up to $15,000 upon assignments of money due from the contract. After the school contract was made, the bank made advances of $32,000, receiving assignments

from the contractor. Thereafter, the city paid the bank $24,196.42 on the assignments. After stating that the contractor did use the borrowed money "in the general conduct of its business," and a discussion of Minnesota cases, the court said (209 N.W. at page 913):

"In the case at bar the contractor could use the money advanced by the bank as it saw fit. The proof is that only about $15,000 of the borrowed money was applied to the payment of bills for labor and materials used ·in the construction of the Gorman schoolhouse as against more than $24,000 received by the bank on the assignments. The equities in favor of the banks concerned in the Wurtz, Ganley, and Remer Cases are absent. Following these cases, it must be held that the surety's right of subrogation is superior to the claim of the bank, and that the conclusion reached by the trial court was correct."

bills on the Lake County and Glenwood contracts and he said he wanted the money to pay claims on these two contracts. Graff said he wanted to borrow this money to pay bills he owed.

"Q. He did not pick the Lake County, South Dakota, or Glenwood, Minnesota, jobs in particular as the ones he wanted to pay on, did he? A. Not particularly, those were the two mentioned in his statement."

He was told that a loan of that amount could not be made without security. This security took the form of an assignment of payments due on the Lake County and the Glenwood contracts, after Graff had procured for the bank the consent of the attorney in fact of the appellant.

Graff gave his note for $4,500 and that amount was placed "to his credit in his checking account."

"Q. And his writing checks during that time was unrestricted, wasn't it? He didn't have to apply it on any particular job? He could use it for paying for material and labor, or for his own personal use? A. We didn't supervise the payment of them.

"Q. It was not ear-marked for any purpose? A. No, sir.

"Q. And you don't know how it did go out? A. No, sir.

"I think perhaps some of it went on the Lake County and Glenwood jobs. I know he was renting equipment from another construction company with which he was doing work; I believe I saw some of the checks payable to that Company. I could not say how much that aggregated. I think I saw checks made out to Erling and Gallagher; I think the name was Atlas Construction Company."

On the date (January 3, 1938) this loan and credit to checking account was made, Graff already had a balance therein of $9,421.71. During January, he made further deposits aggregating $9,738.55. His balance at the end of that month was $8,273.96. At the end of February, the balance was $2,683.13. At the end of March $499.52 and at the end of April, $1.50. There were deposits of $348.03 in February and of $150 in April. During these four months, there were numerous checks by Graff in various amounts and to various payees—some of these checks were in connection with the Lake County and the Glenwood contracts and others were not.

The result of this evidence is that the bank loan was simply an ordinary loan given on security of the assignments of the money due on the Lake County and the Glenwood contracts. While the bank was informed that the money was needed in connection with the Lake County and the Glenwood contracts, it neither assumed any obligation in connection with advancements for those contracts nor did it place any requirement upon Graff to apply the proceeds of the loan thereto. The loan went into his general checking account upon which he drew checks for any purpose he saw fit. Clearly, this situation is not that which, within the Minnesota rule, gives a superior equity to the bank over the surety. Therefore, the surety must prevail unless the consent by the attorney in fact of the surety company prevents.

### (2) The Consent.

As stated hereinbefore, the bank would not make this loan without security therefor. The bank had seen the construction contracts and the bonds securing them. The bank determined to accept, as such security, an assignment by Graff of the "estimates which he had coming", provided Graff "could get the consent of the surety company bonding him" to that arrangement. Graff secured and delivered to the bank a consent, which is as follows:

"Seaboard Surety Company
"Home Office
"80 John Street, New York, N. Y.
"December 30, 1937.
"Rogers & Field, Inc.
"General Agents
"264 Lowry Medical Arts Bldg.
"St. Paul, Minn.
"Tel. No. Cedar 5586
"First National Bank of Sioux Falls
"Sioux Falls, South Dakota
"Gentlemen:
"The Seaboard Surety Company consents to the assignment of unpaid estimates due Albert Graff and Company on Projects FAP 231 A, B, C, D, Glenwood, Sedan, Minnesota and FAP 170 C, Lake County, South Dakota.
"Very truly yours,
"Seaboard Surety Company,
"By Charles M. Shaw,
"Attorney-in-Fact."
"(Seal of Seaboard
"Surety Company)"

Thereafter, Graff executed assignments to the bank and powers of attorney for it

to collect the estimates. Relying upon the consent, assignments and powers of attorney, the bank made the loan.

The parties present several contentions concerning either the effect or the construction of this instrument. Appellant contends that the instrument consenting to assignment of "unpaid estimates due" should be construed as meaning due *at the completion of the contract*. Such construction cannot be accepted. While it clearly meant that future earned estimates should be included, there is nothing in the instrument to exclude the estimates which had been earned at the time. The situation of the parties forbids such exclusion. All parties knew that there were such existing estimates. The bank and Graff knew the purpose of the assignments was to secure a loan. The attorney in fact executing the consent must have known the same because it is difficult to imagine a reason for such an assignment to a bank except for security. The obvious and only purpose for wanting the consent was to secure a waiver by the surety of any superior rights it might have over an assignment to the bank if such consent were not given. To accept the construction urged by appellant would mean that the entire value of such assignment and security would depend solely upon performance of the contract by Graff. If Graff performed the contract, the surety would have no liability and, therefore, its consent would be of no consequence to the bank. We cannot accept this construction. Under the circumstances here, we have no doubt that this instrument was intended to and does cover the estimates involved.

 The major issue as to this instrument is whether Charles M. Shaw, who executed it as attorney in fact for the surety, had such authority so to do as to bind the surety. The power of attorney introduced in evidence was a copy of the power of attorney on file with the Commissioner of Insurance of South Dakota and certified by the Commissioner. So far as here material it is as follows:

"Power of Attorney.

"Know All Men By These Presents: That the Seaboard Surety Company, a corporation of the State of New York, by C. W. French, its President, hath made, constituted and appointed and by these presents does make, constitute and appoint Charles M. Shaw, *its true and lawful At*-torney-in-Fact, at St. Paul, in the State of Minnesota, to make, execute and deliver on its behalf as Surety, bonds and undertakings, * * * to be given for the following purposes only, to-wit:—* * * guaranteeing the performance of contracts other than insurance policies; and executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law allowed.

"Such bonds and undertakings for said purposes, when duly executed by the aforesaid Attorney-in-Fact, shall be binding upon the said Company as fully and to the same extent as if such bonds and undertakings were signed by the President and Secretary of the Company and sealed with its corporate seal.

"This appointment is made under and by authority of a certain By-Law duly adopted by the Board of Directors of the said Company at a regular meeting of that body duly called and held on the 8th day of December, 1927, a duly certified copy of which By-Law is hereto attached, * * *.

"In Witness Whereof, the Seaboard Surety Company has caused these presents to be signed by its President, and its corporate seal to be hereunto affixed duly attested by its Assistant Secretary, this 29th day of December, 1936, at New York, N. Y.

"Seaboard Surety Company,
"By C. W. French, President.
"Attest:

"Henry G. Thole,
"(Seal) Assistant Secretary."

Of the two by-laws attached to the power of attorney, the first (Article XI, par. 6) provided that the president of the surety company might appoint attorneys in fact "upon such terms and with such powers and duties as he may prescribe"; the other (Article XVII, par. 1) is that "All policies, bonds, recognizances, stipulations and all underwriting undertakings shall be valid * * * when executed by an Attorney-in-Fact."

Appellant contends the above power of attorney is not broad enough to cover this consent instrument—hence, it is not bound thereby. Appellee disputes this contention and, in addition, urges that the presence of the corporate seal, affixed to this power of attorney, is prima facie evidence of such authority, which has not been overcome by evidence to the contrary.

*As to the instrument itself*. In the body of this power of attorney, authority is

given broadly to execute this character of bonds. The authority is one of general agency for the purposes set forth. By reference in the body of the power and by attachment thereto, the above by-laws are made part thereof. By paragraph 1 of Article XVII of such by-laws, "All * * * stipulations * * * shall be valid * * * when executed by an attorney in fact." Obviously, this provision had reference to transactions in connection with the bonds which the attorney in fact had authority to execute. There is no express limitation upon this power nor any implied limitation unless it be that such stipulations shall be in connection with bonds authorized, in the power, to be written. If there is ambiguity as to the broad scope of this power, it must be resolved against the surety which chose the wording and turned loose the instrument for others to act on. Persons dealing with the attorney in fact have the right to rely upon the broadest reasonable meaning of this power stated in such general terms. There is no dispute here that appellee did rely upon this "consent" as being effective. We think it was justified in so doing.

This conclusion is further supported by the position taken by the surety when this controversy first arose. On May 31, 1938, the bank wrote the surety that it noted default of Graff and that the surety was proceeding to complete the two contracts. It then stated: "Inasmuch as we hold assignments from Mr. Graff on the South Dakota and Minnesota contracts, together with the consent of your Company, and note that you claim all monies applicable to these contracts, we wonder if you want us to make claim for our note in the amount of $4500.00 and interest to the New York office or shall we present it to the St. Paul office for payment?"

To this the surety answered: "With reference to your letter of May 31st, the effect of the default on the part of Albert Graff & Co. is, of course, to terminate any further right on the part of the contractor to moneys due or to become due on these contracts in South Dakota and Minnesota. Our consent to the original assignments by Graff on these two contracts was, of course, applicable only as to such payments that would become due Albert Graff & Co."

Had it then occurred to the surety that the consent was beyond the power of attorney, the most natural thing would have been to state that as a reason for avoiding the consent. It is significant that the reason actually urged was as to a matter of what the consent covered and not as to such authority. While we do not examine the law as to ratification, we are not considering this action of the surety as an approval or ratification of the consent, so as to make it binding if it were not so before. Nor do we treat such action as preventing or estopping the surety from claiming later that authority in the attorney in fact was lacking. The force of this position taken by the surety is that appellee was justified in relying upon the consent since the scope of the authority was such that, when faced with a claim of rights based on the consent, it did not occur to the surety that there was any lack of authority.

Appellee urges that, even if the power to execute "stipulations" be not construed to cover this consent, the general unlimited power to make bonds includes the power to execute such consent under Indianapolis Rolling Mill v. St. Louis, Fort Scott & Wichita Railroad Co., 120 U.S. 256, 7 S.Ct. 542, 30 L.Ed. 639. We do not examine this contention since we hold that the term "stipulations" as used in this power of attorney covers the consent here. This consent covered both the South Dakota and the Minnesota contracts.

### Conclusion.

We hold that, absent the consent instrument, the equity of the surety would be superior; but that the effect of the consent instrument is to make the equity of the bank superior. So holding, the judgment must be and is affirmed.