### LACY v. MARYLAND CASUALTY CO.

### MURCHISON NAT. BANK v. SAME.

Circuit Court of Appeals, Fourth Circuit.
April 9, 1929.

Nos. 2783, 2784.

Northcott, Circuit Judge, dissenting in part.

E. K. Bryan, of Wilmington, N. C. (Bryan & Campbell, of Wilmington, N. C., on the brief), for appellants.

J. O. Carr, of Wilmington, N. C. (Rountree & Carr, of Wilmington, N. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and COLEMAN, District Judge.

PARKER, Circuit Judge. The appeals in the above-entitled cases were taken from decrees awarding to the Maryland Casualty Company all of the funds due by the North Carolina highway commission on account of certain road contracts. The other claimants were the Murchison National Bank, which held assignments from the contractor, and the administratrix of H. D. Lacy, who claimed a one-half interest in the profits realized from one of the contracts. For convenience we shall discuss the cases together.

The facts are as follows: One C. W. Lacy was awarded a number of contracts by the North Carolina highway commission for the construction of roads in Eastern North Carolina. Among these was contract No. 151 covering a road project in Hyde county and contract No. 378 covering a project in Pender county. The contracts were in the usual form, providing for progress payments on estimates of work accomplished, with retention by the commission of 15 per cent. of the amount of the estimates until the completion of the entire work. The casualty company executed a bond in the case of each contract guaranteeing its performance by the contractor, having previously obtained from him an application in which he agreed to indemnify the company against loss, and which contained, among other provisions, the following, which are the ones pertinent to the controversy here involved, viz.:

"Second. * * * And for the better protection of the said company the undersigned do, as of the date hereof, hereby assign, transfer and convey to it, the said Maryland Casualty Company, all our right, title and interest in and to all the tools, plant and equipment and materials of every nature and description that we may now or hereafter have upon said work, or in, on or about the site thereof, including as well materials purchased for or chargeable to said contract which may be in process of construction, on storage elsewhere, or in transportation to said site; hereby assigning and conveying also all our rights in and to all sub-contracts, which have been or may hereafter be entered into, and the materials embraced therein, and authorizing and empowering said company, its authorized agents or attorneys, to enter upon and take possession of said tools, plant, equipment, materials and sub-contracts, and enforce, use and enjoy such possession upon the following conditions, viz.: This assignment shall be in full force and effect as of the date hereof, should the undersigned fail or be unable to complete the said work in accordance with the terms of the contract covered by said bond, or in event of any default on the part of the undersigned under the said contract. *In event of claim or default under the bond herein applied for all payments specified in the above mentioned contract to be withheld by the obligee until the completion of the work, shall as soon as the work is completed, be paid to the company—and this covenant shall operate as an assignment thereof,* and the residue, if any, after reimbursing the company as aforesaid, shall be paid to the undersigned after all liability of the company has ceased to exist under the said bond, and the company shall at its option be subrogated to all the rights, properties and interest of the undersigned in said contract or contracts. (Italics ours.)

*       *       *       *       *       *       *       *

"Eighth. That these covenants and also all collateral security, if any, at any time deposited with the company concerning the said bond or any other former or subsequent bonds executed for us or at our instance, shall, at the option of the company, be available in its behalf and for its benefit as well concerning the bond or undertaking hereby applied for, as also concerning all other former or subsequent bonds and undertakings executed for us or for others at our request."

On May 24, 1923, Lacy had become insolvent and was unable to obtain funds to carry on the work on contracts 151 and 378. Thereupon he entered into a contract with the casualty company under which the latter agreed to advance the money necessary to complete the contracts, taking as security his road working equipment and certain corporate stock. This contract further provided that the money to be advanced by the casualty company thereunder should be under the joint control of Lacy and the company and should not be paid out except upon the counter signature of its representative, and that all moneys which might be received from the highway commission, "including current estimates and retained percentages," should be deposited in the same fund and disbursed in like manner. The highway commission was promptly advised of the making of this contract and was notified to make no further payments on the road contracts except upon the order of the casualty company.

After the execution of this contract, Lacy continued for several months to prosecute the work under the contracts in his own name but with the funds furnished by the casualty company. Finally, however, the company took over the contracts and completed performance in its own name. No formal notice of default under any of the contracts was ever given to the company by the highway commission. On contract 151, which was nearly completed when taken over, a profit of something over $10,000 was realized. On project 378, however, a loss was sustained amounting to $139,000, and on all of the contracts taken together the loss far exceeded the profits.

The claim of the casualty company arises out of the furnishing of funds for the completion of the contracts, its contention being

that as surety it is entitled to priority over all other assignees and to treat all of the contracts as one contract and apply the profits realized on No. 151 against the losses sustained on the others. The claim of the Murchison National Bank is based upon assignments executed to it by Lacy on March 31, 1923, in which he assigned all moneys then due or thereafter to become due on contracts 151 and 378. On the strength of these assignments, the bank loaned him money to pay for labor and material, and under them it claims the May estimates on both contracts, amounting to $1,543.39 and $6,631.92, respectively. It appears that the highway commission was promptly notified of the assignments, and in acknowledging receipt of the notice the auditor of the commission advised that it would "be governed accordingly."

The claim of the administratrix of H. D. Lacy relates only to contract 151. The parties have stipulated, and the judge below has found as a fact, that after the execution of that contract C. W. Lacy, the contractor, agreed with his brother H. D. Lacy to pay him $50 per week as salary for services on the project covered thereby, and upon its completion to give him one-half of the profits of the contract as additional compensation. One-half of the profits amounted to $5,337.40 and the administratrix of H. D. Lacy claims this under the agreement.

The District Judge denied the claims both of the bank and of the administratrix and held that the casualty company had a prior claim on all of the funds due by the highway commission on both contracts. We think, however, that different principles are applicable in the case of the funds derived from contract 151, on which a profit was realized, from those which apply in the case of the funds due on the other contract, and shall accordingly discuss them separately.

■ So far as the funds due under contract No. 378 are concerned, we think that there can be no question that the decree of the court below was correct. For reasons which we shall discuss later on, we do not think that the assignment contained in the application for bond covered anything but the percentages required to be retained under the contract; but we are satisfied that the rights of the casualty company in the funds due under the contract were not limited to what was conferred by the application. Exchange State Bank v. Federal Surety Co. (C. C. A. 8th) 28 F.(2d) 485. The rule is well settled that, independently of assignment, the surety on a contractor's bond, who completes the contract on default of the principal, is subrogated to the rights of the obligee, and, to the extent necessary to reimburse himself, has an equity in the funds due the contractor, which is superior to that of a mere assignee. Prairie State National Bank v. U. S., 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412; Henningsen v. United States Fidelity & Guaranty Co., 208 U. S. 404, 28 S. Ct. 389, 52 L. Ed. 547; First Nat. Bank v. City Trust Co. (C. C. A. 9th) 114 F. 529; State ex rel. Southern Surety Co. v. Schlesinger, 114 Ohio St. 323, 151 N. E. 177, 45 A. L. R. 371 and note beginning at page 379; Labbe v. Bernard, 196 Mass. 551, 82 N. E. 688, 14 L. R. A. (N. S.) 457, and note; 21 R. C. L. 1113, 1114.

■ The question arises whether this superior equity of the surety extends to the current estimates payable under the contract or merely to the retained percentage. We think that it extends to both. The equity arises because of the obligation of the surety to perform the contract of the principal. Upon his performance of this contract, equity subrogates him to all rights of the obligee as against the principal. Now the obligee, upon default of the principal, is without doubt entitled to apply all moneys unpaid towards the performance of the contract, ignoring any assignments by the principal; and it necessarily follows that the surety upon performing the contract, being subrogated to the rights of the obligee, is entitled to the moneys unpaid so far as necessary to reimburse his loss. If the surety, instead of performing the contract, elects to pay damages, it can be held for no more than the amount which the obligee is compelled to pay to complete the work over and above the amount which it has on hand at the time of the principal's default, for this is all the damage that the surety sustains. But when this happens the surety receives the benefit of the unpaid current estimates as well as the retained percentages. Equity, of course, will not place him in worse position where he performs the contract of the principal in accordance with his obligation than where he elects to respond in damages.

And this conclusion we think is supported by authority as well as by reason. The leading case on the rights of the surety is Prairie State Bank v. U. S., supra, in which the opinion was written by Mr. Justice White. Although that case dealt with rights in a retained percentage, the principles upon which the decision was based support as well the right of the surety to unpaid current estimates. The court there said:

"Hitchcock's right of subrogation, when it

became capable of enforcement, was a right to resort to the securities and remedies which the creditor (the United States) was capable of asserting against its debtor Sundberg & Company, had the security not satisfied the obligation of the contractors, and one of such remedies was the right based upon the original contract to appropriate the ten per cent. retained in its hands. If the United States had been compelled to complete the work, its right to forfeit the ten per cent. and apply the accumulations in reduction of the damage sustained remained. The right of Hitchcock to subrogation, therefore, would clearly entitle him when, as surety, he fulfilled the obligation of Sundberg & Company, to the government, to be substituted to the rights which the United States might have asserted against the fund."

Likewise, it may be said here that if the highway commission had been compelled to finish the work, it had the right to forfeit the amounts due on unpaid current estimates as well as the retained percentage, and the right of the casualty company to subrogation entitled it to be substituted to the right which the highway commission might have asserted against these funds.

In the case of Henningsen v. U. S. Fidelity & Guaranty Co., 208 U. S. 404, 28 S. Ct. 389, 52 L. Ed. 547, no distinction whatever was made with regard to retained percentage, but the surety was held entitled to a prior equity on a general balance due under a contract, in preference to a bank holding an assignment from the contractor. The court, speaking through Mr. Justice Brewer, said:

"Henningsen, for we may leave Clive out of consideration, entered into a contract with the United States to construct buildings. The Guaranty Company was surety on that contract. Its stipulation was not merely that the contractor should construct the buildings, but that he should pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for. He did not make this payment, and the Guaranty Company, as surety, was compelled to and did make the payment. Is its equity superior to that of one who simply loaned money to the contractor to be by him used as he saw fit, either in the performance of his building contract or in any other way? We think it is. It paid the laborers and materialmen and thus released the contractor from his obligations to them, and to the same extent released the Government from all equitable obligations to see that the laborers and supply men were paid. It did this not as a

volunteer but by reason of contract obligations entered into before the commencement of the work."

In First National Bank v. City Trust, etc., Co., supra (C. C. A. 9th) 114 F. 529, the question here was directly involved and decided; the court, through Judge Gilbert, pointing out that the controlling consideration in the Prairie State Bank Case "was, not that the deferred payment had been, by the words of the contract, reserved, but that the money in controversy was still in the hands of the government, subject to its power to apply the same upon the unfinished contract if it had undertaken the completion thereof." Applying this principle to the facts in that case, the learned judge said:

"By abandoning the contract the contractors lost the right to compel the city to pay them any sum whatever on account of the work which they had done. Their assignee, the bank, stood in no better position than they. The city undoubtedly had the right to declare the contract and all unpaid sums which it had promised to pay thereunder forfeited. That it had this right is not disputed, but it is said that the city has not exercised it, and that, therefore, the right cannot avail the surety. But the true inquiry is, not what has the city done, but what had it the right to do? It had the right, if it had itself assumed the completion of the abandoned work, to retain for its own protection not only the stipulated 30 per cent., but all sums then due or earned under the contract, and no assignment by the contractors could defeat that right."

And see, also, State ex rel. Southern Surety Co. v. Schlesinger, supra; Exchange State Bank v. Federal Surety Co., supra (C. C. A. 8th) 28 F.(2d) 485; Maryland Casualty Co. v. Dulaney Lumber Co. (C. C. A. 5th) 23 F.(2d) 378; Fulton Nat. Bank v. Fulton County, 144 Ga. 691, 87 S. E. 1023.

The subject is elaborately treated in the note to the Schlesinger Case to which we have previously referred, 45 A. L. R. at page 381 et seq., and we agree with what is said by the author there, viz.:

"On principle, it should make no difference whether the funds sought by the surety represent a reserved percentage, or funds which the contractor would have been entitled to demand before default,—i. e., funds other than any percentage of the earnings which the contractee would be entitled to retain,— as the right of the contractee (to which the surety is subrogated) to apply funds in its hands already earned by the contractor, but unpaid, to the completion of the work aban-

doned, in no wise depends upon any stipulation in the contract reserving to the contractee the right to retain a percentage of the earnings as a guaranty for further performance."

■ The point is made that there was no default under the contract, and that consequently the right of subrogation on the part of the casualty company did not arise. It is true that the work under the contract was not interrupted and no notice of default was given to the casualty company, but it appears that on May 24, 1923, the contractor had become insolvent and was unable to proceed with his contract and that the company, without waiting for notice, advanced the funds to carry on the work, notified the highway commission that it was doing so, and eventually took the contract over. There can be no question that the company did this, not as a volunteer, but because of legal necessity, i. e., because it had guaranteed the performance of the contract and the contractor was financially unable to perform it. Under the principles laid down in the Prairie State Bank and Henningsen Cases, therefore, it is clear that the right of subrogation arose. Being compelled because of its contract to advance money to prevent a breach of the contract of the principal, the surety is in no different position, we think, from what it would occupy if it had made the advancement after breach or had performed the contract itself. It is the payment under necessity because of the contract of suretyship, and not the breach of the principal's contract, which entitles the surety to subrogation. But if it were material in the application of the principle that there be a breach or abandonment of the contractor's obligation, it appears that the contractor abandoned the contract and same was taken over by the surety while the funds here in controversy were yet in the hands of the highway commission.

■ No importance, we think, is to be attached to the fact that notice of the assignments was given the commission by the bank or that in acknowledging receipt of the notice it agreed to be governed accordingly. Neither the notice nor the acknowledgment conferred any right in the funds greater than that to which the contractor was entitled. When he became insolvent and the casualty company was obliged to finance the project, it was subrogated to the rights of the commission, which were, of course, superior to those of the contractor or his assignee. The learned District Judge was correct, therefore, in holding that the casualty company was entitled to the funds arising from contract 378.

■ When we come to the funds realized from contract 151, however, a different situation exists. It appears that the Hyde county project was nearly completed when the surety company began financing it, and that, as heretofore stated, there was realized therefrom a profit of exceeding $10,000. The surety's right of subrogation extends only so far as may be necessary for its reimbursement, and any funds remaining thereafter should be applied to the claims of assignees or other persons entitled thereto. First National Bank v. City Trust, etc., Co., supra (C. C. A. 9th) 114 F. 529, 533. The casualty company, therefore, was not entitled under the principles of subrogation to the profit derived from this contract except in so far as might be necessary to reimburse it for expenditures made thereunder.

The question then arises whether the casualty company is entitled to these funds under the assignment heretofore quoted which is contained in the application for the bond securing this contract. It contends that it is. Its position is that, admitting that the funds are not necessary for its reimbursement, and admitting that the assignments to the bank and H. D. Lacy are valid, nevertheless it holds a valid prior assignment which pledges the funds as security for losses sustained, not only under this contract, but also under all other contracts which it had guaranteed for C. W. Lacy. If this position is sound, the casualty company is entitled to the funds, for it is not questioned that its losses on the other contracts far exceeded the profits derived from this.

■ ■ We think that its position is sound as to the retained percentage. The application in question by a covenant contained in the second paragraph, which we have italicized, assigned to the casualty company, in event of claim or default, the retained percentage under the contract. When the contractor became insolvent and the company was obliged to finance the project and ultimately to take it over, there was certainly a "default" within any fair meaning of the language used, and the assignment of the covenant thereupon became effective. The eighth paragraph made this retained percentage available as security, not only for loss sustained on the bond covering the particular project, but also for loss sustained upon any other bond executed by the company for the contractor.

We have carefully considered the case of Southern Surety Co. v. Town of Greeneville

(C. C. A. 6th) 261 F. 929, and we do not think that it conflicts with our decision here. In that case an assignment clause conveyed tools and equipment as security, with a provision that it should be null and void if the company should suffer no loss under the bond; and it was held that such assignment clause was not a covenant within the meaning of a general clause like that embodied in clause eight of this contract. Here, however, the clause assigning the retained percentage refers to itself as a covenant, and there are other differences in language which clearly distinguish this case from that.

We do not agree with the contention of the company, however, that anything more is assigned than the retained percentage. The language is, "all payments specified in the above mentioned contract to be withheld by the obligee until the completion of the work, shall, as soon as the work is completed, be paid to the company—and this covenant shall operate as an assignment thereof." This does not assign all moneys due under the contract, but the "payments specified in the above mentioned contract to be withheld," i. e., what are commonly referred to as the retained percentages, the percentage withheld from the progress payments on current estimates. And we think also, on the principle that the language of the printed application is to be construed most strongly against the company, that payments "specified to be withheld" is limited strictly to the percentage of the progress payments retained by the Commission and does not include the final payment, which is not "to be withheld" but to be paid when due upon the completion of the contract.

It is suggested that the language, "and the company shall at its option be subrogated to all of the rights, properties and interests of the undersigned in said contract or contracts," assigns the funds due to the contractor so as to make them security under paragraph 8 for losses sustained under other contracts. We do not think so. The express assignment of the retained percentage immediately preceding this shows that this was not intended as an assignment but merely as an agreement for subrogation. It is clear that subrogation to the rights of the contractor could not be of benefit to the company, for the contractor could not hold the funds in controversy against the claims of his assignees. The language of the applica-

tion should not be given a strained interpretation to the end that profits realized upon this contract may be applied by the surety upon other losses, to the exclusion of a bank which holds a valid assignment for money furnished to carry on the work under the contract, and to the exclusion of the rights of a superintendent through whose efforts the profits were realized.

Our conclusion, therefore, as to the funds realized from contract No. 151, is that the casualty company is entitled to be reimbursed for its expenditures in connection therewith and for this purpose may use the retained percentages under this contract, applying the remainder of such retained percentages against its losses on other contracts. It holds the retained percentages for the purpose of applying them on other contracts, not under the equitable theory of subrogation, but as assignee. But, as assignee, it takes priority over the assignments to H. D. Lacy and to the bank because its assignment was first in time and is therefore first in right. Salem Trust Co. v. Manufacturers' Finance Co., 264 U. S. 182, 44 S. Ct. 266, 68 L. Ed. 628, 31 A. L. R. 867. Any remainder of the funds arising from this project is applicable to the claims of the bank and the administratrix of H. D. Lacy; but as the facts do not sufficiently appear upon these records to enable us to determine the amount of the funds which will be applicable to their claims or to pass upon any conflicting equities as between them, the cases will be remanded to the end that these matters may be passed upon by the District Judge.

In No. 2783, the decree of the District Court is reversed and the case is remanded for further proceedings in accordance with this opinion.

In No. 2784, the decree is affirmed in so far as it affects the funds derived from contract 378, and reversed as to the funds derived from contract 151, and the case is remanded for further proceedings in accordance herewith.

Case No. 2783, reversed.

Case No. 2784, affirmed in so far as it affects the funds derived from contract 378, and reversed as to the funds derived from contract 151.

NORTHCOTT, Circuit Judge, dissents as to the conclusions reached as to contract No. 151.