## SEABOARD SURETY CO. v. STATE OF NORTH DAKOTA et al.
### Civ. No. 1738.

United States District Court, D. North Dakota. S. W. D.

Nov. 9, 1950.

Cox, Cox, Pearce & Engebretsen, Bismarck, N. D., for plaintiff.

Nels G. Johnson, Bismarck, N. D., for defendant State Highway Department of North Dakota.

Hyland & Foster, Bismarck, N. D., and Strutz, Jansonius & Fleck, Bismarck, N. D., for defendant Dakota Nat. Bank of Bismarck, N. D.

VOGEL, District Judge.

This is an action for the recovery of money. The Seabord Surety Company, a corporation, hereafter referred to as the "surety", is plaintiff. The State of North Dakota and the Highway Department of the State of North Dakota, together referred to here as "The State of North Dakota", and Dakota National Bank of Bismarck, North Dakota, hereafter called the "bank", are defendants. Diversity of citizenship and more than the statutory amount are involved. All jurisdictional requirements of a United States District Court have been satisfied.

On September 12, 1947, the Rolfson Construction Company submitted a bid to the State of North Dakota for the construction of a certain highway. Rolfson's bid was accepted by the State of North Dakota on September 18, 1947, and the contract between the parties executed on that date. Contemporaneously therewith, and upon

Rolfson's application, the surety furnished a bond to the state conditioned upon Rolfson's faithful performance of the contract, including the payment of all bills incurred for labor and material. Rolfson properly completed the contract but failed to pay certain lawful claims for labor and material. Upon notification of Rolfson's default, the surety, in pursuance of the provisions of its bond, undertook to and did pay labor and material claims approximating $29,000.00.

On September 12, 1947, prior to the execution of the contract, but in contemplation thereof, Rolfson, in consideration of promised advances and loans, executed an assignment to the bank of all of his earnings under the contract and directed the State of North Dakota to remit checks for such earnings to the bank. The assignment stated that the "advances and loans" were "for material, supplies, equipment and labor for the successful completion of the * * *" contract. It contained the following condition:

"From the moneys received by the Assignee, the aforementioned advances are to be deducted, and the remaining balances credited to the checking account of the undersigned."

On September 13, 1947, the bank gave the State of North Dakota written notice of the assignment.

In reliance upon Rolfson being the successful bidder for the contract, the bank advanced $30,000.00 on September 12, 1947. During the performance of the contract by Rolfson, the bank received from the State of North Dakota, on its assignment, $93,098.93. The bank made other advances to Rolfson during the contract, the last such advance being April 8, 1948, in the amount of $10,000.00. Upon receiving checks from the State of North Dakota, it deducted various amounts and credited others to Rolfson's checking account so that at the completion of the contract Rolfson still owed the bank $10,000.00 plus interest.

When the contract was completed and accepted, there remained in the hands of the State of North Dakota a "retained percentage" of the contract price totalling approximately $15,552.00.

The surety, as plaintiff, brings this suit against the State of North Dakota and the bank, asking that the sum still retained by the State of North Dakota be held to be subject to an equitable lien in its favor and that such lien be held prior and superior to any rights obtained by the bank through its assignment. The bank contends that its rights to the retained fund are superior to the rights of the surety, that it should be paid first, and that the balance, if any, go to the surety. The State of North Dakota admits having the retained fund and states that it is ready and willing to deposit such amount in court to be paid to whomsoever the court may determine to be entitled thereto.

The surety claims that it at no time consented to an assignment of the contract funds to the bank and that it had no notice or knowledge of the existence of such assignment to the bank until after default in the contract had occurred and that it possesses a lien on the fund involved by virtue of the established doctrine of equitable subrogation.

The bank contends that, while notice to or consent of the surety was unnecessary to the establishment of their rights, the surety did in fact have knowledge of the assignment to the bank and that agents of the surety knew that the bank was financing Rolfson on this contract.

There is no proof that the surety consented to the assignment so the Court will first consider the question of knowledge of or notice to the surety of the existence of the prior assignment to the bank. Sometime prior to obtaining the contract, Rolfson communicated with one F. A. McDonna, an insurance agent in Bismarck, advising him that he proposed submitting a bid for the contract and inquiring about obtaining a bond. Mr. McDonna was not an agent of the surety, had no contract with it but he had, through the Bridston Insurance Agency of Grand Forks, North Dakota, procured the writing of another bond or bonds by the surety. The surety did have an agent at Bismarck but no con-

tact was made with him. Mr. McDonna informed Rolfson that: (Tr. p. 111)

"* * * the better thing for him to do was to go directly to a company that was handling bonds, to let them determine whether he would be qualified to bid on that particular letting or not."

McDonna suggested communicating with the T. C. Field and Company in St. Paul, Minnesota, the latter being the general agent of the surety for this territory. Thereafter McDonna and Rolfson went tc St. Paul and conferred with the T. C. Field and Company. The latter, as general agents for the surety, agreed to the execution of the bond. As a part of the conference with Rolfson, Mr. Field talked with Mr. Heath, president of the bank, on long distance telephone but during that conversation there was no reference to the assignment. (Tr. p. 17)

"Q. Now Mr. Heath, in that telephone conversation, did you tell Mr. Field that the bank was going to secure an assignment of all of the earnings under this contract? A. I don't recall that I did. I was principally interested in knowing whether or not they were going to be able to get the bond." (Tr. p. 18)

"Q. (By Mr. Pearce) Did you tell Mr. Field that you were going to advance any money to Mr. Rolfson? A. I don't recall that I did."

Through Rolfson, however, the bank attempts to establish knowledge of the assignment on the part of Field. (Tr. p. 57)

"A. I explained my financial prearrangement with Mr. Heath, also the equipment that was held in store for me at Smith, Inc., here in Fargo, which I did not at that time own. I explained to him (McDonna) the amount of money or the amount of downpayment I would have to make on this equipment and the amount of money I would have left to operate on for the first month until an estimate came in, and, further, the assignment that Heath had on the contract with the Highway Department, * * *.

"Q. Was that same discussion had in the office of Mr. T. C. Field? A. Principally the same thing."

The testimony of Rolfson is discredited, however, by subsequent testimony to the effect that in financial statements given to the plaintiff he specifically denied having assigned, pledged, sold or discounted his accounts receivable or retained percentages. (Tr. pp. 76, 78, 80, 82.)

Knowledge of any obligation by the Rolfson Construction Company to the Dakota National Bank or an assignment by Rolfson to the Dakota National Bank is emphatically denied by Field: (Tr. p. 116)

"Q. At any time during that conference, did Mr. Rolfson tell you about a debt to the Dakota National Bank at Bismarck? A. No, sir.

"Q. Did he tell you at any time that he had made an assignment to the bank, meaning the Dakota National Bank, of any part of the contract or the earnings under it for which he had acquired the bond? A. No, sir.

"Q. Did you or your company ever receive any notification from the Dakota National Bank that they held an assignment? A. Not to my knowledge.

"Q. Did you or your company or any authorized agent of your company in behalf of Seaboard Surety Company ever consent that an assignment be made? A. No, sir."

█ The Court must conclude, then, from the weight of the credible testimony that the T. C. Field and Company, acting on behalf of the surety, had not consented to an assignment of the funds due from the State of North Dakota for the completion of the contract and that the T. C. Field and Company had no knowledge of the prior assignment to the bank.

█ The next question, then, is whether McDonna had knowledge of the assignment and, if so, was he such an agent or representative of the surety as would charge the surety with that knowledge. As to knowledge of McDonna, we have his testimony: (Tr. p. 112)

"Q. Did Mr. Rolfson tell you, Mr. McDonna, anything about having assigned any portion of this contract or the earnings under it to the Dakota National Bank?

A. Not at that time. I might add that I learned about that later but that was after the job had been completed and there was some controversy about this matter that is up in court now. I didn't know it at that time.

"Q. The first you knew, then, of the assignment was quite some time afterwards when there had been some difficulty? A. That is true, yes."

As opposed thereto, we have the testimony of the president of the bank to the effect that he mentioned the assignment in a conversation over the telephone with McDonna. (Tr. p. 16) The same witness, however, in talking with the man who was to pass on whether the bond would be written (Field) failed to make mention of the assignment or the advances or loans. It appears of not too great moment, however, as the Court must conclude that McDonna was not the agent of the surety in the procuring of the bond. McDonna was first contacted by Rolfson. He had no contract with the surety. The surety had an agent of its own in Bismarck. McDonna, at best, was a broker, who in the present instance represented Rolfson in trying to find a company that would write the bond, required by law to obtain the contract.

The Court concludes that the surety had no knowledge of the prior assignment and gave no consent thereto.

Our situation, in brief, then, is this: The bank possessed an assignment of the contract funds executed prior to the making of the contract and prior to the issuance of a bond by the surety. The bank, in relience on the assignment and also upon the statement by Field that the surety would issue a contract bond, but without disclosing to the surety its assignment or obtaining consent thereto, proceeded to advance $30,000.00 to Rolfson which was used by Rolfson in performing the contract and probably in making downpayments on certain equipment to be used on the contract. During the performance of the contract, the bank made other advances to Rolfson and received payments of $93,098.93, a portion of which was credited against the advances made to Rolfson and the balance deposited in Rolfson's checking account. At the end of the contract, Rolfson still owed the bank $10,000.00 plus interest. Upon Rolfson's default in payment of labor and material bills, the surety, in accordance with its bond, paid out approximately $29,000.00 thereon. The State of North Dakota has in its hands a retained percentage of the contract price, so held for the protection of the state, itself, and the labor and material men. The general specifications adopted by the State of North Dakota provide: "9.5. Partial Payment. The engineer will make current estimates monthly of the total amount in value of the materials in place complete and work performed in accordance with the contract. From the total of the amount as ascertained will be deducted an amount equivalent to 10% of the whole to be retained until the completion of the entire contract in an acceptable manner, and the balance less any previous payment made will be certified by the engineer to the proper authorities for payment. * * * *Any or all installments may be withheld indefinitely until any or all terms of the contract have been fulfilled by the contractor."* (Emphasis supplied.)

The contract provides: "That for and in consideration of the payments hereinafter mentioned * * * the Contractor promises and agrees * * * to pay or cause to be paid as they become due, all claims for any work or labor performed * * *."

In this instance, we are, of course, concerned with the substantive law of the State of North Dakota. Neither party has been able to cite any decision from the Supreme Court of North Dakota which could assist in solving the difficulty. In the absence of such state authority, this Court must itself determine the question. That the surety in entitled to assert the equitable doctrine of subrogation as against the retained percentages there can be no doubt. The question is whether or not the bank's assignment, made prior to the issuance of the bond, is superior to the surety's right. No contract would have been entered into between Rolfson and the State of North Dakota but for the issu-

ance of the bond. This was known to the bank, and the bank withheld advancing funds to Rolfson until informed by the surety that the bond would be furnished. If the bank were a mere volunteer, even with its assignment, the answer is not difficult. The surety's rights would then become paramount. But the bank is not a mere volunteer. It had a definite interest in the contract through its advance of the original $30,000.00 and subsequent advances. It had an interest to protect and an obligation to perform in financing Rolfson in his contract obligations.

An examination of the equities of the two parties is essential. There is no question but what the loss of the surety represents payment to labor and material men in the performance of the contract and that the retained percentage, the right to which is in dispute, was withheld in part for the protection of such labor and material men. Can the bank's loss be said to enjoy equal status in its contribution toward performance of the contract? The Court must conclude that it cannot. True, we have the statement in the assignment that the bank's advances were to be for "material, supplies, equipment and labor for the successful completion of the * * *" contract, and the testimony of Rolfson that the moneys borrowed from the bank on the assignment were used for labor and material and other necessary expenses on the project. (Tr. p. 70) There is, however, the intimation that a portion of the money was to be used to make down payments on certain equipment purchased from Smith and Co. There was an entire lack of supervision on the part of the bank to see that its advances were used to pay for labor and material and other essentials to the performance of the contract. When it received checks from the State of North Dakota, it deducted apparently what it thought necessary to protect its own interests or advancements and deposited the balance in Rolfson's checking account. It made no attempt to follow the latter funds and we have no sure way of knowing how they were used. They may have gone into equipment used partially on this and other jobs. They may have been partially dis-

sipated in many ways. The very fact that Rolfson ended up by owing bills for labor and material approximating $25,000.00 on a job, the entire cost of which was $105,892.25, may be some indication that all of the $105,892.25 did not go into contract performance and that lack of supervision of disbursement was responsible.

The bank contends for what may be referred to as the Minnesota rule. That rule, as stated by Judge Stone in Seaboard Surety Co. v. First Nat. Bank & Trust Co., 8 Cir., 121 F.2d 288, 292, is that " * * * the equity of the surety, through subrogation, is superior to that of one loaning money to the contractor, even though such money goes into performance of the contract, *unless* such money is loaned under a contract obligating the lender to make advances (whether or not limited as to aggregate amount) to the contractor for use in performance of the work contract and' unless such advances are so used", (Emphasis supplied) citing: National Surety Co. v. Berggren, 126 Minn. 188, 148 N.W. 55. In that case, Seaboard Surety Co. v. First Nat. Bank & Trust Co., supra, the Court of Appeals for this Circuit also stated 121 F.2d at page 291: "Appellee urges we should follow what it says is the rule in Minnesota. No sufficient reason is stated why this South Dakota situation should be governed by the rule of Minnesota any more than that of any other State. We think we should follow the doctrine heretofore announced in the federal courts. That has been clearly announced by the Supreme Court (Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, and Prairie State Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412) and by this Court (Riverview State Bank v. Wentz, 8 Cir., 34 F.2d 419). In principle, these three cases are not distinguishable from the one now before us. All of them determine the superior equity to be in the surety. We so hold as to the South Dakota situation."

■■ In the absence of North Dakota authority, this Court would be bound to follow the United States Court of Appeals for this Circuit as announced in the fore-

going case unless it should find that the equities of the parties made that rule inapplicable. The Court cannot so find. The assignment to the bank was made at a time when no contract existed between Rolfson and the State of North Dakota. There was actually nothing to assign. The proposed contract could not come to fruition without the issuance of a statutory bond, such as the surety provided in the instant case. The question, then, of priority in time appears not too important. Certainly the surety's rights with reference to equitable subrogation became effective when its obligation was fixed—that is, by the execution of the bond and its acceptance by the State of North Dakota. The bank's rights under its assignment became effective only after there was in existence something to assign. The surety's bond had to be issued and accepted by the State of North Dakota before the contract could come into existence. That was a necessary prerequisite and known to be such by the bank. The Court must conclude, then, that the execution of the assignment prior to the existence of the contract gave the bank no superior rights. The Court must also conclude that because there is no definite sureness that the advances made by the bank were used wholly and entirely in the performance of this contract that its equities are not on a par with those of the surety. This would mean that even under the Minnesota rule, were that to be applied, the surety's rights would still be held to be superior to those of the bank. Even in jurisdictions following the Minnesota rule, the rights of a surety, through the doctrine of equitable subrogation, are superior to the rights of a contractor's assignee who has loaned money on such assignment, where the money loaned is not definitely specified for the performance of the contract and it is not established that it was all used for that purpose. In the instant case, the rights of the surety to the retained fund are held to be superior to the rights of the bank on its assignment.

An additional issue was injected into the case by virtue of a motion made by the bank on March 1, 1950, during the pendency of the instant case, whereby the bank moved the Court to allow an amendment to its answer. In the amendment the defendant contends that the surety had made an election by virtue of the fact that it had contemporaneously with the filing of the instant suit brought a separate suit against Rolfson for the amount of its payments for labor and material. In the latter action, the surety secured a judgment against Rolfson covering such payments made by it. That judgment remains unsatisfied. At the time the motion was presented, the Court reserved ruling on the propriety of allowing the amendment. In order that an appellate court may have before it the entire picture, should this determination be reviewed, the Court now orders that the amended answer be allowed and filed.

■■ In connection with the additional defense set forth in the bank's amended answer, it is the contention of the surety that the suit against Rolfson became necessary so that upon the establishment of the right of equitable subrogation the State of North Dakota would be in a position to safely turn over the money in its hands to the surety. Counsel for the defendant bank quote at length from American Jurisprudence and cite cases with reference to the doctrine of election of remedies. The citations appear to this Court to be inapplicable. This Court can see nothing inconsistent in the surety company's suit against Rolfson and its suit to establish the priority of its equitable subrogation against the fund now held by the State of North Dakota. The remedies pursued are not inconsistent but merely cumulative. A creditor may pursue any or all of his remedies until he has satisfaction for his debt. He may have but one satisfaction but until that has been had, he is free to move against all but inconsistent sources of recovery, even to the point of obtaining final judgment against one or all of them. The judgment against Rolfson is unsatisfied. If the surety should recover in this suit, then, of course, the amount of its recovery would be a partial satisfaction of the judgment obtained in the suit against Rolfson. The surety may not recover twice for the same loss. See Brown v. Christman, 1942, 75 U.S.App.D.C. 203, 126 F.2d 625, 631:

184

█

"* * * Nor is an action against a principal inconsistent with the assertion of an equitable lien against a trust fund. As stated by this court: 'The doctrine of election, where it applies at all, applies only to a case where one assumes an inconsistent position, or where, through his action, other rights have arisen as to which he should be estopped to take a contrary position. It is never applicable where, as here, a creditor has a right to pursue more than one remedy.' The remedies in this case are cumulative and nothing less than complete satisfaction of appellants' claims would operate as a bar."

In so holding, the above court cited New Amsterdam Casualty Co. v. Iowa State Bank, 8 Cir., 1 F.2d 196, 199, decided by the United States Court of Appeals for this Circuit.

See also F. C. Austin Mfg. Co. v. Decker, 109 Iowa 277, 80 N.W. 312, 313: "* * * The bank was, at least, a bailee, and, we are inclined to think, was a surety for the performance of defendant's contract. The verdict of the jury and the judgment against Decker were conclusive as to his liability, and defendant's promise was simply collateral to that of its co-defendant. There is no room here for the application of the doctrine of election of remedies. The remedies were not inconsistent, but concurrent and cumulative. Of course, if the judgment against Decker had been satisfied, there could be no recovery from the bank; but, when the remedies are concurrent and cumulative, the plaintiff may adopt either or both, at his election, and he is not concluded if he adopts but one until he has received satisfaction. In instituting an action against Decker the plaintiff did nothing which was inconsistent with its right to proceed against the bank. The whole doctrine of election is based upon the theory that there are inconsistent rights or remedies of which a party may avail himself, and a choice of one is held to be an election not to pursue the other. The principal does not apply to co-existent and consistent remedies. Kearney Milling & Elevator Co. v. Union Pac. Ry. Co., 97 Iowa, 719, 66 N.W. 1059. See Moller v.

Tuska, 87 N.Y. [166] 169; Morris v. Rexford, 18 N.Y. 552."

█ Accordingly, the Court holds that the bringing of the suit against Rolfson and obtaining judgment therein was not inconsistent with the instant action and is no bar thereto.

Counsel for the plaintiff are directed to prepare and submit proposed Findings, Conclusions and Order for Judgment in harmony with the foregoing. Copies thereof shall be served upon counsel for opposing parties, who may have ten (10) days thereafter within which to file objections.