## Hartford Accident and Indemnity Co. v. State Public School Building Authority

*Charles N. Capunto* and *Elmer E. Harte, for* plaintiff.

*Ray, Coldren & Buck* and *McNees, Wallace & Nurick,* for intervening plaintiff.

*Allen Shaffer,* Deputy Attorney General, for the State Public School Building Authority, defendant.

*W. Robert Thompson,* for Brownsville Construction Co., defendant.

NEELY, P. J., January 9, 1961.—In this proceeding in equity, plaintiff, Hartford Accident and Indemnity Co., herein called "surety," was the surety on the performance and labor and material bonds involved herein. Defendants are State Public School Building Authority, herein called "authority," and Brownsville Construction Company, herein called "contractor." The contractor, on May 31, 1957, entered into a construction contract, no. 529-446-1, with the authority for the building of several school building units in the

Borough of Deemston, Washington County, at a contract price of $1,068,000. The performance bond, as well as the bond for labor and materials, was made part of the contract, in furtherance of the provisions of section 10 of the Act of July 5, 1947, P. L. 1217, as amended, 24 PS §791.10.

The complaint filed December 15, 1958, alleges the contract and that the contractor was in financial difficulties; that a certain requisition for a monthly installment payment in the amount of $73,184.22 (requisition no. 16) had been submitted to the authority according to the terms of the contract; that the authority was preparing its check for such installment for delivery to the contractor; that said installment had been assigned as security for other indebtedness; that said monthly installment payment might be diverted to the payment of such other indebtedness, and the surety then called upon to respond to the terms of its bonds given to secure the performance of the contract and the payment of laborers and materialmen. The bill prays for a preliminary and permanent injunction restraining the authority from paying, and the contractor from receiving, any part of the monthly installment and asks for the appointment of a receiver.

After notice to all parties, this court, on December 15, 1958, entered a preliminary injunction enjoining the authority from paying and the contractor from accepting the installment payment. The parties to the record at that time agreed that the court should enter this injunction.

The Gallatin National Bank, herein called "bank," intervened as a party plaintiff and filed its complaint on January 14, 1959, in which it averred that on May 10, 1956, in order to secure a line of credit, the contractor assigned to the bank all of its accounts receivable, present and future; that the contractor and the bank executed financing statements which were filed in the offices of the Prothonotaries of Washington

County and Fayette County on May 12, 1956, and in the office of the Secretary of the Commonwealth on May 14, 1956; that in reliance on the installment payment and the specific account receivable of the contractor due from the authority in said amount of $73,184.22, credit in the amount of $58,400 was extended to the contractor for the purpose of paying labor and material claims in connection with contract no. 529-466-1. The bank asserts a prior claim in the balance in the hands of the authority by virtue of the assignment dated May 10, 1956. The surety filed an answer to the bank's complaint on March 2, 1959, with new matter denying the bank's claim and the bank replied. It should be noted that the intervention of the bank was allowed on January 14, 1959, by agreement of all parties.

The authority has filed a stipulation that it now holds in its hands the sum of $16,777.42, which is the sum now due for work performed under the construction contract. The authority acknowledges that the money in controversy is due and owing and is willing to pay this money into court, or to any other person or persons as the court may direct. The question raised by the pleadings is to whom this balance now in the hands of the authority as a stakeholder should be paid.

The parties have entered into a stipulation of the facts, and we adopt that stipulation as our findings of fact in this case. The pertinent findings will herein be discussed to the extent necessary to the disposition of the matter now before us.

In its application to the surety for the execution of performance and labor and material bonds, as required by the Act of July 5, 1947, supra, 24 PS §791.10, the contractor, on May 31, 1957 (the date of the application), assigned to the surety its rights under the construction contract, which assignment was contingent upon the surety's being obliged to fulfill any of the terms of that contract in the event of the con-

tractor's default, or was required to make payment for labor and materials. The construction contract was also executed on May 31, 1957, and those matters pertaining to execution of the performance and labor and material bonds were incorporated into that contract.

The construction contract provided that the contractor should receive from the authority installment payments as the work progressed. These have sometimes been referred to as progress installment payments. There was a provision, however, for the retention by the authority of 10 percent of each installment payment and for the withholding of the final installment payment until the construction contract had been completed and the school building units accepted by the authority. The contractor entered upon the work, and, in accordance with the terms of the contract, received from the authority, as the work progressed, installment payments in the amount of $672,041.48, based upon periodical estimates which had been approved by the authority.

On November 21, 1958, the contractor submitted to the authority estimate and requisition no. 16 for installment payment in the amount of $73,184.22. As of November 21, the retained percentage withheld from prior installment payments amounted to $82,802, the total accumulated installment payments in the hands of the authority (including estimate no. 16 and the retained percentages from prior estimates not then payable) being the sum of $155,986. On November 20, 1958, the contractor's accounts payable for labor and materials on this construction project totaled approximately $216,923.

The contractor, on November 25, 1958, notified the surety that it was unable to proceed with its contract, and further that it could not meet its obligations to laborers and materialmen. The surety on December 12, 1958, after completing an audit of the contractor's financial condition, notified the authority that the con-

tractor was in default, and on the same day filed a financing statement in the offices of the Prothonotaries of Fayette and Washington Counties and in the office of the Secretary of the Commonwealth. This financing statement consisted of the application for the bond by the contractor, containing the contractor's assignment of rights to the surety under the contract. After the default by the contractor, the surety completed the work and the authority has accepted the school building units as of November 19, 1959.

The contractor was a Pennsylvania corporation engaged in building construction work. Its principal place of business was in Brownsville, Fayette County. It did its financing with the intervenor and from time to time borrowed sums of money on the security of accounts receivable. On May 10, 1956, the contractor, for value, executed an assignment of its accounts receivable in the broadest terms, present and future, to secure all indebtedness to the bank, present and future.

The contractor and bank executed and caused to be filed in the prothonotaries' offices of Washington and Fayette Counties on. May 12, 1956, and in the office of the Secretary of the Commonwealth on May 14, 1956, financing statements consisting of the assignment of May 10, 1956, thereby giving notice of the bank's interest in the contractor's accounts receivable, present and future.

The bank from time to time, commencing with May 10, 1956, made extensive loans to the contractor, all of which were repaid. Schedules of such accounts and repayments included sums advanced for the payment of labor and materials on the construction contract involved herein. The contract of suretyship, on which the surety predicated its claim, was executed on May 31, 1957, and became effective more than one year after the original assignment from the contractor to

the bank and the filing of the financing statement by the bank in the offices above mentioned.

When the contractor embarked on the work under this contract, it borrowed money from the bank, and in each instance made a specific assignment of an installment payment due to the contractor from the authority on the basis of monthly estimates submitted to the authority on its requisition forms. And on November 21, 1958, the contractor submitted to the bank a schedule of accounts payable, including in this schedule a list of payments due for labor and materials as of that date, together with an assignment of estimate no. 16 in said amount of $73,214.22. Thereupon, the bank extended to the contractor a credit of $58,-400, which sum was credited to the contractor's bank account and used for the payment of labor and materials in connection with construction contract no. 529-466-1. Part of this loan had been repaid, and on December 12, 1958, there was due the sum of $26,-214.74, which apparently was the amount involved when the complaint was filed. Since the filing of the complaint, the amount in the hands of the authority has been reduced, by agreement of all parties, to the sum of $16,777.42, as hereinabove indicated, and it is this amount that is in controversy in this suit.

Which of these two claimants, the bank or the surety, is entitled to the funds in the hands of the authority as a stakeholder? In resolving this question, we must consider the provisions of the Uniform Commercial Code of April 6, 1953, P. L. 3, 12A PS §4-101, et seq. The bank contends that it has a right to these funds because the assignment of May 10, 1956, was a secured transaction, viz., a security agreement which was duly perfected by filing the same as a financing statement, as required by the code. We shall consider this contention of the bank and also the countervailing arguments of the surety. In considering the various ap-

plicable provisions of the code, we will make reference only to the parts which we deem are pertinent to this inquiry.

We must first consider the code's definitions (section 9-105, 12A PS §9-105), which state that " 'security agreement' means an agreement which creates or provides for a security interest"; and that " 'Secured party' means a . . . person in whose favor there is a security interest. . . ." Among the secured transactions for which the code sets out a comprehensive scheme for the regulation of security interests in personal property ". . . are those in the form of pledge, assignment . . .": section 9-102, 12A PS §9-102. And this same section states that the provisions concerning security interests in personal property apply "(1) . . . (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property including . . . accounts or contract rights; . . ."

In section 9-302, 12A PS §9-302, it is provided that a financing statement must be filed to perfect all security interests, except in instances specified in this section that are not pertinent herein. "(a) . . . a security interest is perfected . . . at the time of filing, . . .": Section 9-303, 12A PS §9-303. The place of filing is "(a) . . . in the office of the Secretary of Commonwealth and in addition if all of the debtor's places of business are in a single county, in the office of the Prothonotary of that county": Section 9-401, 12A PS §9-401.

The facts in this case show that the contractor made an assignment of present and future accounts on May 10, 1956. The contractor's principal place of business is in Fayette County, and the security interest of the bank was perfected by filing the financing statement in the office of the prothonotary of that county on May 12, 1956, and in the office of the Secretary of the

Commonwealth on May 14, 1956, as well as in the office of the Prothonotary of Washington County on May 12, 1956, where the contractor also was engaged in business.

Since the account in question grows out of the installment payment based on estimate no. 16, and since this account, of course, was not in existence at the time the assignment of May 10, 1956, was executed, the question arises as to whether the assignment of future accounts on this latter date was valid. The answer to this question again, we believe, is to be found in the provisions of the code.

Section 9-204(3), 12A PS §9-204(3), provides, with an exception not here relevant, that ". . . (4) a security agreement may provide that collateral, whenever acquired, shall secure any advances made or other value given at any time pursuant to the security agreement." This section would seem plainly to contemplate that the security agreement made secure future advances. And sections 9-312(1) and (3), 12A PS §§9-312(1) and (3), are particularly pertinent in this respect. An attempt was clearly made on the part of the legislature to make provision concerning conflicting interests in after-acquired collateral, the situation with which we are confronted in this case. In this last named section, it is provided as follows:

"(3) A secured party who has a perfected security interest and who acquires rights in after-acquired collateral under a term in the security agreement takes priority as to such rights from the time when his security interest was originally perfected, whether or not he makes advances on the after-acquired collateral, . . ."

It seems clear to us that under the provisions of section 9-204(3), the code contemplated that a security agreement can secure advances made in the future. And section 9-312(3), 12A PS §9-312(3), expressly

provides that one who has perfected a security interest acquires rights in after-acquired collateral *"from the time when his security interest was . . . perfected."* The bank here was a secured party under the terms of the security agreement, the assignment of May 10, 1956. The security agreement was perfected by filing the financing statement in the offices of the two prothonotaries and in the office of the Secretary of the Commonwealth.

Absent any conflicting influences, the bank would acquire rights in this security, the installment payment based on estimate no. 16, as of the date when its security interest was perfected, viz., the dates on which the filings occurred in the offices above mentioned. Progress payment no. 16 did not, of course, ripen into an account until November 21, 1958, when the contractor made an assignment to the bank of the installment due on that date. There was, at that time, collateral acquired by the bank within the meaning of section 9-204(3). It should be noted that value of $42,-000 was given by the bank when the assignment of May 10, 1956, was made: exhibit "N" of the stipulation of facts.

These provisions of the code would seem to indicate that the bank has a prior interest in this fund in the hands of the authority. We cannot, however, reach this final conclusion until we have fully considered the rights of the surety.

The surety argues that this transaction with the authority and the contractor does not come within the provisions of the Uniform Commercial Code. It would seem that the surety's conduct in filing its financing statements in the offices of the two prothonotaries and also with the Secretary of the Commonwealth on December 12, 1958, in accordance with the provisions of the code, are somewhat inconsistent with the conten-

tion now advanced, viz., that the surety does not come within the provisions of the code.

There is a paucity of decisional law on the particular aspect of the matter involved in this dispute. However, our attention has been directed to a case decided by Judge Gourley in United States v. G. P. Fleetwood and Company, Inc., 165 F. Supp. 723 (D. C. W. D. Pa., 1958). Judge Gourley stated that the assignment of a contract to the surety which was executed in the application for the contractor's bond is a security agreement within the meaning of the code, the perfecting of which agreement must be accomplished by filing the same as a financing statement in accordance with the provisions of sections 9-302 and 9-403 thereof. It is stated in his opinion, page 725, as follows:

". . . the instrument which contains the assignment (the application for bond) is governed by the Pennsylvania Uniform Commercial Code. . . .

"The Code clearly defines a 'contract right' as a right to payment under contract not yet earned by performance. . . . I so construe the instant security agreement. . . . The perfecting of such security agreement must be accomplished by appropriate recording." (Parentheses supplied.)

"Contract right," as defined in section 9-106 of the code, 12A PS §9-106, "means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." We incline very much to the view of Judge Gourley that the assignment to the surety in the application for bond in this case gave the surety a "right to payment under a contract not yet earned by performance." It was a right, of course, that was contingent upon default by the contractor and the surety's incurring obligations under its bonds.

The surety's contention here is that its right in this fund is based upon its equitable right of subrogation.

The surety's contention is that having acquired all the rights of the owner, the authority, under the construction contract and of the laborers and materialmen, it has an absolute right to the contract funds as against the assignee bank. The surety contends that it stands in the shoes of the authority as well as the laborers and materialmen and derives its right from them in this particular fund.

The surety has cited Lancaster County National Bank's Appeal, 304 Pa. 437 (1931), as standing for the proposition that it is entitled to priority in this fund as against the assignee bank. In that case, the contractor was awarded a contract by the owner for the construction of a certain section of highway, and the contract provided for the payment of laborers and materialmen. In the application for performance and labor and materialmen bonds, the contractor assigned his rights under the contract to a surety. After much work had been performed under the contract, as part of a loan agreement, the contractor assigned the semifinal payment to the assignee bank. Before this assignment was made, however, the contractor defaulted and the surety was called upon to pay certain materialmen and laborers. The surety and the bank each claimed priority in the remaining fund. The court found, however, that the bank had constructive notice of the contractor's prior assignment to the surety, and, accordingly, the priority of the surety's earlier assignment in the application for bonds was accorded priority. In the Lancaster County National Bank case, the assignee bank's rights attached after the surety had acquired its rights under the prior assignment, of which the bank had constructive notice. The Supreme Court said, at page 443:

". . . It is not disputed that the bank was affected with notice that there was a surety, which became liable to pay the materialmen and workmen if the con-

tractor did not. This liability being statutory, and known by the bank to be so, common prudence called upon it, before it made its loan, *to inquire into the circumstances under which the surety assumed that liability: . . .*" (Italics supplied.)

There are two Federal cases cited by both parties which merit our consideration: In Prairie State National Bank of Chicago v. United States, 164 U. S. 227 (1896), the United States entered into a contract for the erection of a customs house. By the terms of the contract, a performance bond was required, and the same was provided by an individual surety. The contract provided that the United States could retain until final completion and performance one-tenth of the earned payments as they became due. Two years after the contract was entered into, the contractor assigned his final payment to the Prairie State Bank. The contractor defaulted and the surety completed the contract. In a contest between the bank and the surety for retained percentages, the Supreme Court of the United States held that the surety's equity was superior to that of the bank. It will be observed that in this case the bank's interest attached two years after the work had been in progress under the contract, and that the equity of the bank, which was acquired in 1890, was subordinate to the surety's equity of subrogation to the rights of the owner, the government, which had arisen in 1888.

There is another Federal case in which the rights of the surety are held superior to those of the assignee bank: Henningsen v. United States Fidelity and Guaranty Company, 208 U. S. 404 (1908). In that case, a contractor entered into a contract with the United States for the construction of certain buildings and executed both performance and labor and materialmen's bonds, as required by the statute. Although the buildings were constructed in accordance with the con-

tract, the contractor failed to pay all claims for labor and materials and the surety was compelled to make the necessary payments therefor. The surety then laid claim to the funds in the hands of the United States, in opposition to an assignee bank which had loaned money to the contractor to be used by him in any way he saw fit. The assignment to the bank was subsequent in point of time to the execution of the labor and material bond. The court held that the surety's right of subrogation took priority over any interest of the assignee bank.

The surety, in the instant case, contends that each of these three cases last cited supports its contention that it has a prior interest in the funds now retained by the authority on account of estimate no. 16. We are confronted here with a situation that was not involved in any of the three cases last cited, viz., how do the provisions of the Commercial Code affect those rights of the surety which accrued after the bank's security interest attached by virtue of perfecting the security agreement dated May 10, 1956? Stated another way, did the bank's perfected security agreement protect the bank for advancements in the future against the surety whose rights arose after the filing of the security agreement?

Both of the parties have cited numerous authorities pertaining to the law of suretyship and the conflicting interests of sureties and other creditors and involving sureties' rights of subrogation: Massachusetts Bonding and Insurance Company v. State of New York, 259 F. 2d 33 (C. A. 2d, 1958) ; National Surety Corporation v. The United States, 133 F. Supp. 381 (U. S. Court of Claims, 1955) ; Royal Indemnity Co. v. United States, 93 F. Supp. 891 (U. S. Court of Claims, 1950) ; Seaboard Surety Co. v. State of North Dakota, 94 F. Supp. 177 (D. C. S. W. D. N. D., 1950) ; United States v. Munsey Trust Co. of Washington, Re-

ceiver, 332 U. S. 234 (1947) ; Hardin County Savings Bank v. United States, 65 F. Supp. 1017 (Court of Claims, 1946) ; City of Philadelphia, etc., v. National Surety Corporation, 140 F. 2d 805 (C. C. A. 3, 1944) ; Maryland Casualty Co. v. City of Pittsburgh, 51 F. Supp. 459 (D. C. W. D. Pa., 1943) ; In re L. H. Duncan & Sons, 127 Fed. 2d 640 (C. C. A. 3, 1942) ; Dubois, Trustee, v. United States Fidelity and Guaranty Co., 341 Pa. 85 (1941) ; Town of River Junction v. Maryland Casualty Co., 110 F. 2d 278 (C. C. A. 5, 1940) ; American Surety Company's Appeal, 334 Pa. 317 (1939) ;   Maryland Casualty Company v. National Bank of Germantown & Trust Company, 320 Pa. 129 (1936) ; American Surety Company of New York v. Kunkle, Admr., 117 Pa. Superior Ct. 525 (1935) ; Sundheim v. Philadelphia School District, 311 Pa. 90 (1933) ; Farmers' Bank v. Hayes, 58 F. 2d 34 (C. C. A. 6, 1932) ; Mock, Trustee, v. Bechtel, 101 Pa. Superior Ct. 181 (1931) ; Lacy v. Maryland Casualty Company, 32 F. 2d 48 (C. C. A. 4, 1929) ; Maryland Casualty Co. v. Delaney Lumber Co., 23 F. 2d 378 (C. C. A. 5, 1928) ; South Philadelphia State Bank, etc., v. National Surety Co., 288 Pa. 300 (1927) ; Phillips' Estate, 205 Pa. 515 (1903) ; Annotations, 45 A. L. R. 379, 134 A. L. R. 738, 164 A. L. R. 613.

We have read these cases and they are most informative. None of them, however, reach the central question that now confronts us, viz., which takes precedence, the bank's rights under the code, or the surety's right of subrogation? In the dispositive aspects of this matter, there is presented here clearly a case of first impression.

There are, of course, equities on both sides of this dispute. From the bank's standpoint, it had made successive loans for the completion of this work and had taken all the steps that it could by perfecting its security agreement, as required by statute. The surety, on

the other hand, entered into its contract of suretyship with its contingent assignment of the contractor's rights and with the right to be subrogated to the rights of the owner, the authority, for any default in this contract. It seems to us that when the contract of suretyship was entered into on May 31, 1957, the surety was affected with constructive notice that there was a prior perfected security agreement in favor of the bank which called for future advancements based on the assignment of May 10, 1956.

Just as in the Lancaster County National Bank case, the bank was affected with constructive notice of the rights of the surety, we think by the same token here the surety must be affected with such notice concerning the rights of the bank under the earlier assignment of May 10, 1956. Applying the language in the Lancaster County National Bank case to this situation, we believe that there was some duty on the surety to make inquiry concerning the circumstances attendant upon the bank's security agreement which provided for future advances.

In North Pacific Bank v. Pierce County, 24 Wn. 2d 843, 167 P. 2d 454 (1946), it was held that an assignment by a public contractor to a bank of funds to become due under the contract as security for advances by the bank, where notice was given to the debtor county of the assignment, was entitled to priority over the assignment in the application for the contractor's bond with respect to amounts earned under the contract before default. One of the elements in determining the bank's priority in this case was the fact that notice of the bank's assignment before the default and before advancements was given to the county (owner). It seems to us that the rationale of this case on the question of notice has some application here. The bank's assignment of estimate no. 16, of course, was before the contractor's default, and we believe the

filing of the financing statement gave notice of the bank's interest. Furthermore, because of the extensive assignments of prior estimates, the authority had knowledge of the bank's interest in this particular contract, all of which transpired, of course, before default. Official comment to section 9-402 of the Uniform Commercial Code of April 6, 1953, 12A PS §9-402, describes the effect of the filing of financing statements as follows:

"2. This Section adopts the system of 'notice filing' which has proved successful under the Uniform Trust Receipts Act. . . . The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs."

It is our considered judgment that the assignment to the bank of May 10, 1956, was a secured transaction within the meaning of the Uniform Commercial Code which sets forth a comprehensive scheme for the regulation of security interests in personal property. There is nothing in the code which we can find that would entitle us to hold that because a right of subrogation attaches subsequent to a security agreement, duly perfected as required by the code, precedence should be given to this subrogation over the prior secured transaction. In our judgment, the plain provisions of the code require us to recognize the bank's priority in this fund.

In its brief filed on May 10, 1960, the surety advanced the argument that, independent of the right of subrogation, it was entitled to a priority in this fund by virtue of the assignment of May 31, 1957. The surety's contention in this respect was summed up in this brief as follows:

"The surety's assignment (in the application for bonds dated May 31, 1957), being a part of the origi-

nal contract between the authority and the contractor is entitled to priority over the assignment made by the Contractor to the Bank."

At the oral argument, leave was granted to file a supplemental brief, and in this brief, filed on November 2, 1960, the surety argues as follows:

"At the outset, the Surety wishes to emphatically restate its contention that it is not claiming the money being held by the School Authority by virtue of the assignment to it in the bond application. The Surety is entitled to the money in question on the theory of the equitable doctrine of subrogation."

We have already stated our views concerning subrogation, and perhaps we should, in conclusion, state our views concerning the respectve assignments involved. The bank's assignment of May 10, 1956, and the surety's assignment of May 31, 1957, both pertain to future events. It should be noted that the surety's assignment of May 31, 1957, was contingent upon the future event of a default in the contract, just as the assignment to the bank of May 10, 1956, pertained to future accounts payable. The assignment to the bank of estimate no. 16 on November 21, 1958, was prior in point of time to the future contingency of default referred to in the surety's assignment of May 31st; this future default contingency did not occur until the contractor notified the surety on November 25, 1958, of its inability to continue the contract.

Thus, it can be seen that with respect to both of these assignments (May 10, 1956, and May 31, 1957) pertaining to future events, in point of time the bank's interest in the future event (estimate no. 16) attached before the interest of the surety (contractor's default). In these circumstances, we believe that no claim for prior interest in the fund in dispute can be predicated upon the assignment of May 31, 1957.

## Conclusions of Law

1. The Gallatin National Bank has a prior interest in the fund of $16,777.42 now in the hands of the State Public School Building Authority as a stakeholder.

2. A decree should be entered awarding a money judgment to the Gallatin National Bank for the said sum of $16,777.42.

## Decree Nisi

And now, January 9, 1961, it is ordered, adjudged, and decreed that judgment in the sum of $16,777.42 be and the same hereby is entered in favor of the Gallatin National Bank and against the State Public School Building Authority. The said State Public School Building Authority is directed to make payment of this sum to the said Gallatin National Bank, intervening plaintiff herein. The prothonotary is directed to enter this decree nisi and notify the parties to this proceeding, or their counsel, forthwith. If no exceptions are filed within 20 days after the entry of this decree, a final decree will be entered. The costs of this proceeding shall be paid by plaintiff, Hartford Accident and Indemnity Company.